1  **ARBOGAST & BERNS LLP**
   David M. Arbogast (SBN 167571)
2  darbogast@law111.com
   Jeffrey K. Berns, Esq. (SBN 131351)
3  jberns@law111.com
   19510 Ventura Boulevard, Suite 200
4  Tarzana, California 91356
   Phone: (818) 961-2000
5  Fax:    (818) 654-5988

6
   **BROWNE WOODS GEORGE LLP**          **BROWNE WOODS GEORGE LLP**
7  Michael A. Bowse (SBN 189659)        Lee A. Weiss (admitted *pro hac vice*)
   Mbowse@bwgfirm.com                   lweiss@bwgfirm.com
8  2121 Avenue of the Stars, Suite 2400 Rebecca Tingey (admitted *pro hac vice*)
   Los Angeles, CA 90067                rtingey@bwgfirm.com
9  Phone: (310) 274-7100               49 West 37th Street, 15th Floor
   Fax:    (310) 275-5697              New York, New York 10018
10                                      Phone: (212) 354-4901
                                        Fax: (212) 354-4904
11 [*Additional counsel listed on signature page*]
   Attorneys for Plaintiffs and all others Similarly Situated
12

13                   **UNITED STATES DISTRICT COURT**

14        **NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION**

15
16  ENEIDA AMPARAN, RAFAEL CISNEROS    )  **CASE NO. 5:07-cv-04498-JF (RSx)**
    and GUADALUPE CISNEROS, individually )
17  and on behalf of all others similarly situated, )  ***CORRECTED* THIRD AMENDED CLASS**
                                         )  **ACTION COMPLAINT FOR:**
18             Plaintiffs,               )
                                         )  **(1)   Violations of the Truth in Lending Act, 15**
19                                       )        **U.S.C. §1601, *et seq*;**
         v.                              )
20                                       )  **(2)   Fraudulent Omissions; and**
                                         )
21  PLAZA HOME MORTGAGE, INC.;           )  **(3)   Violation of Bus. & Prof. Code §17200, *et***
    WASHINGTON MUTUAL MORTGAGE           )        ***seq*. – "Unlawful," "Unfair" and**
22  SECURITIES CORP.; WAMU ASSET         )        **"Fraudulent" Business Practices.**
    ACCEPTANCE CORP.; COUNTRYWIDE        )
23  HOME LOANS, INC.; COUNTRYWIDE        )
    BANK, FSB; and DOES 5 through 10 inclusive, )
24                                       )        **JURY TRIAL DEMANDED**
               Defendants.               )
25                                       )
                                         )
26  _____ )

27

28

---
THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

Plaintiffs Eneida Amparan, Rafael Cisneros and Guadalupe Cisneros ("Plaintiffs"), individually, and on behalf of all others similarly situated allege as follows:

## I.

## INTRODUCTION

1.      This is an action pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601, *et seq.,* California's Unfair Competition Law (the "UCL"), Bus. & Prof. Code §§ 17200, *et seq.,* and other statutory and common law.  Plaintiffs, individually, and on behalf of all others similarly situated ("Class Members") bring this action against Plaza Home Mortgage, Inc., Washington Mutual Mortgage Securities Corp., WAMU Asset Acceptance Corp., Countrywide Home Loans, Inc., Countrywide Bank, FSB, and Does 5-10 (collectively, "Defendants"), based upon Defendants' failure to clearly, unambiguously and conspicuously disclose to Plaintiffs and the Class Members, in the loan documents for Defendants' Option Adjustable Rate Mortgage ("Option ARM") loans, and in the accompanying required disclosure statements: (i) the actual interest rate on the Notes (12 C.F.R. § 226.17); (ii) that the initial interest rate disclosed in the Notes would last only one month, was discounted, and was substantially lower than the actual interest that Plaintiffs and Class Members would be actually charged on the Notes; (iii) that the amount of monthly payments provided for in the Notes and for the first three to five years in the Truth in Lending Disclosure Statement ("TILDS") was based entirely on the "teaser" rate; and (iv) that the amount of the monthly payments after one month would not be sufficient to even pay the interest being charged, let alone amortize the loan, so that each month the principal balance would increase even if the payments were made as scheduled (12 C.F.R. § 226.19).  Hereinafter, (i) through (iv) shall be referred to as "The Material Omissions".

## II.

## THE PARTIES

2.      Plaintiff Eneida Amparan is, and at all times relevant to this Complaint was, an individual residing in San Jose, California.  On or about January 5, 2006, Ms. Amparan refinanced her existing home loan and entered into an Option ARM loan agreement with Plaza Home Mortgage, Inc. The Option ARM loan was secured by Ms. Amparan's primary residence.  Attached hereto as Exhibit 1 are true and correct copies of the Note, TILDS and Program Disclosure (collectively the "Loan

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

1   Documents"), pertinent to this action.

2       3.    Plaintiffs Rafael Cisneros and Guadalupe Cisneros are, and at all times relevant to this

3   Complaint were, individuals residing in Menifee, California.  On or about October 13, 2006, Mr. and

4   Mrs. Cisneros refinanced their existing home loan and entered into an Option ARM loan agreement with

5   Plaza Home Mortgage, Inc.   The Option ARM loan was secured by Mr. and Mrs. Cisneros' residence.

6   Attached hereto as <u>Exhibit 2</u> are true and correct copies of the Loan Documents pertinent to this action.

7       4.    Defendant Plaza Home Mortgage, Inc. ("Plaza Home") is, and at all relevant times was,

8   qualified to do business in California, and doing business in this judicial district.  Defendant Plaza Home

9   is a California corporation licensed to do business and doing business in California.  At all relevant

10  times hereto Plaza Home was and is engaged in the business of originating, distributing and selling the

11  Option ARM loans that are the subject of this Complaint.  Plaza Home transacts business in Santa Clara

12  County, California and at all relevant times originated, distributed, and sold Option ARM loans

13  throughout the United States, including Santa Clara County, California.  Plaza Home has significant

14  contacts with Santa Clara County, California, and the activities complained of herein occurred, in whole

15  or in part, in this District.

16      5.    From its headquarters in San Diego, California, Plaza Home, in concert with the other

17  Defendants, created, approved, sold, controlled and/or dictated the terms of the Option ARM loans that

18  are the subject of this complaint.  Plaza Home sold a significant number of the subject Option ARM

19  loans to California residents.  Plaintiffs are informed, believe, and thereon allege that Plaza Home's

20  employees and/or agents who were responsible, in concert with the other Defendants, for the creation,

21  design, approval and sale of the subject Option ARM loans, were located in California.  Additionally,

22  Plaza Home's  decisions concerning approval of the loan forms and/or approval of the Plaintiffs' and

23  Class Members' loans were authorized and/or approved by Plaza Home's corporate officers, executives

24  and employees located in California.

25      6.    Defendant Washington Mutual Mortgage Securities Corp. ("WMMSC"), previously

26  named and sued herein as DOE 1, is and/or was a Delaware Corporation.  According to the August 23,

27  2005 Prospectus for WMMSC's mortgage pass-through certificates ("August 23, 2005 Prospectus"),

28  WMMSC was organized for the purpose of providing mortgage lending institutions with greater

financing and lending flexibility by purchasing mortgage loans from such institutions and issuing

mortgage-backed securities.  Plaintiffs are informed, believe, and thereon allege that Defendant Plaza

Home sold Plaintiff Amparan's Option ARM loan that is the subject of this action to Defendant

WMMSC.  Plaintiffs are therefore informed and believe that WMMSC purchased or otherwise is and

was an assignee of some of the Option ARM loans that are the subject of this Complaint, including

Plaintiff Amparan's loan.

      7.    Defendant WAMU Asset Acceptance Corp. ("WAAC"), previously named and sued

herein as DOE 2, is and/or was a Delaware Corporation.  WMMSC and WAAC entered into a Mortgage

Loan Purchase and Sale Agreement on December 28, 2005, pursuant to which WMMSC sold Plaintiff

Amparan's Option ARM loan to WAAC.  WAAC then served as the Depositor pursuant to a Pooling

and Servicing Agreement and deposited Plaintiff Amparan's Option ARM loan into a trust to be

securitized.  Plaintiffs are therefore informed and believe that WAAC purchased or otherwise is and was

an assignee of some of the Option ARM loans that are the subject of this Complaint, including Plaintiff

Amparan's loan.

      8.    Plaintiffs are informed, believe, and thereon allege that Defendants WMMSC and

WAAC were and are engaged in the business of purchasing, packaging, designing, and securitizing

some of the Option ARM loans that are the subject of this Complaint, including Plaintiff Amparan's

loan.  Plaintiffs are further informed, believe, and thereon allege that:

          (a)    Pursuant to a purchase agreement between WMMSC and Plaza Home, WMMSC

agreed to purchase and did purchase numerous Option ARM mortgages

originated by Plaza Home.  WMMSC then sold those loans to WAAC, which

deposited the loans into trusts to be securitized.  WAAC is, and/or was, in the

business of, among other things, securitizing home mortgage loans by packaging

those loans into trusts or other vehicles so that it could sell bonds to investors

based on the income to be derived from those loans.  Accordingly, WMMSC and

WAAC are critical and necessary participants in the securitization process.

          (b)    Pursuant to the purchase agreement between Plaza Home and WMMSC, Plaza

Home and others collected fees from the homeowners to whom it sold the Option

4

1    ARM loans as well as from WMMSC, while WAAC collected revenues through

2    the securitization process.

3    (c)    WMMSC's agreement to purchase the Option ARM loans sold by Plaza Home

4           and others was critical to Plaza Home's ability to market and sell those loans to

5           Plaintiffs and other homeowners, since Plaza Home and other similarly situated

6           originators lacked the financial resources to continue to issue the Option ARM

7           loans here at issue.

8    (d)    While providing a stream of financing to Plaza Home, WMMSC and WAAC

9           were aware of The Material Omissions.

10   9.     Defendant Countrywide Home Loans Inc., also sometimes known as Countrywide Home

11   Loans, Inc. d/b/a America's Wholesale Lender  ("CHL"), previously named and sued herein as Doe 3, is

12   a California corporation and, at all material times in this Complaint, was qualified to do business in

13   California, and its headquarters and principal place of business is located in California.  Defendant

14   Countrywide Bank, FSB ("Countrywide Bank"), previously named and sued herein as Doe 4, was, at all

15   material times in this Complaint,  qualified to do business in California, and its headquarters and

16   principal place of business is located in California.  Defendants CHL and Countrywide Bank shall be

17   collectively referred herein as "Countrywide."

18   10.    Plaintiffs are informed, believe, and thereon allege that on November 3, 2006, Plaza

19   Home sold and/or assigned Plaintiffs Cisneros' Option ARM loan that is the subject of this action,

20   together with all rights and liabilities associated therewith, to Defendant Countrywide.  Plaintiffs are

21   therefore informed and believe that Countrywide purchased or otherwise is and was an assignee of some

22   of the Option ARM loans that are the subject of this Complaint, including Plaintiffs Cisneros' loan.

23   Plaintiffs are further informed and believe that Countrywide was and is engaged in the business of

24   purchasing, packaging, designing, and securitizing some of the Option ARM loans that are the subject

25   of this Complaint.  Plaintiffs are further informed, believe, and thereon allege that:

26   (a)    Countrywide is, and/or was, in the business of, among other things, securitizing

27          home mortgage loans by packaging those loans into trusts or other vehicles so

28          that it could sell bonds to investors based on the income to be derived from those

5

loans.  Countrywide is a critical and necessary participant in that securitization process.

(b)      Countrywide agreed to purchase and did purchase numerous Option ARM mortgages originated by Plaza Home and others.  Through that arrangement, Plaza Home and others collected fees from the homeowners to whom it sold the Option ARM loans as well as from Countrywide, while Countrywide collected revenues through the securitization process.

(c)      Countrywide's agreement to purchase the Option ARM loans sold by Plaza Home and others was critical to Plaza Home's ability to market and sell those loans to Plaintiffs and other homeowners, since Plaza Home and other similarly situated originators lacked the financial resources to continue to issue the Option ARM loans here at issue unless it was able to sell them to investors such as Countrywide.

(d)      While providing a stream of financing to Plaza Home, Countrywide was aware of The Material Omissions.

11.      Plaintiffs are informed, believe, and thereon allege that Does 5 through 10, inclusive, are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters, CDO trustees, hedge funds or other entities that acted as additional lenders, loan originators and/or are assignees to the loans which are the subject of this action.  Plaintiffs will seek leave of Court to replace the fictitious names of these entities with their true names when they are discovered.

12.      The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 5 through 10, inclusive, and each of them, are unknown to Plaintiffs at this time, and Plaintiffs therefore sue said Defendants by such fictitious names.  Plaintiffs allege, on information and belief, that each Doe defendant is responsible for the actions herein alleged.  Plaintiffs will seek leave of Court to amend this Complaint when the names of said Doe defendants have been ascertained.

13.      At all times mentioned herein, Defendants were engaged in the business of originating, selling, securitizing, servicing, and/or owning, and/or are or were the assignees of, the Option ARM loans that are the subject of this Complaint, throughout the United States, including in Santa Clara

County, California.

14.     Plaintiffs are informed, believe, and thereon allege that each of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, were proximately caused by the conduct of Defendants.

15.     Plaintiffs are informed, believe, and thereon allege, that at all times material hereto and mentioned herein, each of the Defendants sued herein was the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, aider and abettor, assignee and/or alter-ego of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego, partnership or employment and with the authority, consent, approval and ratification of each remaining Defendant.

16.     Plaintiffs are informed, believe, and thereon allege that at all times herein mentioned, each Defendant was acting in concert or participation with each other, and/or aided and abetted the other Defendants, and/or was a joint participant and collaborator in the acts complained of, and /or was the agent or employee of the others in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together.  Each Defendant was the co-conspirator, aider and abettor, agent, servant, employee, assignee and/or joint venturer of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the permission and consent of each of the other Defendants.

17.     Pursuant to California Civil Code § 1459 and California Code of Civil Procedure § 368, Defendants WMMSC, WAAC and Countrywide are the subsequent purchasers and/or assignees of Plaintiffs' and Class Members' Option ARM loans.  At all times relevant, Defendants are and/or were sophisticated and knowledgeable entities whose businesses included designing, originating, purchasing, packaging, securitizing and selling interests in the subject Option ARM loans.  The subject Option ARM loans at issue are non-negotiable instruments within the meaning of Civil Code § 1459 and at all times relevant, Defendants purchased, packaged, securitized and/or sold the subject Option ARM loans with

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

1  full knowledge of the failures to disclose and material omissions as alleged herein.   Defendants

2  therefore "stand in the shoes" of the assignor, taking their rights and remedies, subject to any defenses

3  that the obligor (Plaintiffs and Class Members) has against the assignor  prior to notice of the

4  assignment.  15 U.S.C. § 1641 provides that assignees are liable for violations that are apparent on the

5  face of disclosure documents and other assigned loan documents.

6                                          **III.**

7                        **JURISDICTION AND VENUE**

8          18.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 1601, *et seq.* and 28

9  U.S.C. §§ 1331 and 1367(a).

10         19.     The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), the

11 "Class Action Fairness Act," as the amount in controversy exceeds $5,000,000.00 and many Class

12 Members are citizens of different states than Defendants.

13         20.     This Court has personal jurisdiction over the parties in this action, because Defendants

14 are corporations or other businesses duly licensed to do business in California.

15         21.     Venue is proper within this District and Division pursuant to 28 U.S.C. § 1391(b),

16 because a substantial part of the events and omissions giving rise to the claims occurred in this District,

17 and because there is personal jurisdiction in this District over the named Defendants because they

18 regularly conduct business in this judicial district.

19                                          **IV.**

20                    **FACTS COMMON TO ALL CAUSES OF ACTION**

21         22.     Defendants, and each of them, created, designed, purchased, sold, distributed, owned

22 and/or are assignees of the Option ARM loans that are the subject of this Complaint.

23         23.      The Option ARM loans that are the subject of this Complaint are the loans originated

24 and/or sold by Defendant Plaza Home with the following common characteristics: (i) the Monthly

25 Payment Amount stated in the Note is based upon a low "teaser"  interest rate which ranges from 1% to

26 3%; (ii) the payment schedule listed in the TILDS, for the first 3-5 years of the Note, is based upon a

27 fully amortizing payment at the "teaser" interest rate; (iii) the interest rate "adjusts" after only one

28 month to a rate which is the sum of the "index" and the "margin"; and (iv) after the first 3-5 years, the

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

1  amount of the monthly payments increases.

2       24.    Defendants knew that for Plaintiffs' and Class Members' loans, the sum of the index and

3  the margin would necessarily result in an interest rate that always exceeded the "teaser" rate by several

4  percentage points.  As a result, after only one month, the interest accruing on the note more than

5  doubled  from an amount which was usually below 2% to an amount of at least 4%, and in some cases

6  up to 8%.  Because of this dramatic interest rate adjustment after only one month, the monthly payment,

7  which was calculated based on a fully amortizing payment at the low teaser rate, was no longer

8  sufficient to even pay the interest which accrued on the note, and the balance owed increases even if the

9  payments are made as scheduled on the Note and the TILDS.  This process is known as negative

10  amortization, and Defendants knew it was *certain to occur* because of the large spread between the

11  teaser rate and the combined index and margin.  Indeed the margin alone was consistently higher than

12  the "teaser" rate.  Even if the index went down to zero, the combined total of the margin and index

13  would never be close to the "teaser" rate, and thus the Option ARM loans at issue would always, and

14  were designed to, cause negative amortization.  Defendant Plaza Home never disclosed to Plaintiffs and

15  Class Members this material information.  Had Defendant disclosed this material information, Plaintiffs

16  and Class Members would not have purchased the subject Option ARM loans.

17       25.    Because of the way Defendant Plaza Home structured the Option ARM loans at issue, it

18  was certain that, as the scheduled payments were made each month, each Class Member would owe

19  more money than he or she did at the start of the loan, and have less time to pay it back.  Indeed, every

20  time Plaintiffs and Class Members made a payment in the amount reflected in the TILDS, the principal

21  balance on their loans increased.  To make matters worse, this "deferred interest" was added to the

22  principal balance and, in turn accrued more interest – in effect using compound interest to increase the

23  balance owed by each borrower.

24       26.    Although Defendant Plaza Home knew that negative amortization was certain to occur,

25  they never disclosed this to Plaintiffs or Class Members, who refinanced their homes and entered into

26  these loans without ever receiving this material information.  Had Plaza Home disclosed this material

27  information, Plaintiffs and Class Members would not have purchased the subject Option ARM loans.

28  / / /

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

27.     The two most important pieces of information in any mortgage loan are the interest rate and the amount of the monthly payments.  For the subject Plaza Home Option ARM loans, the disclosures of both pieces of this information were misleading and omitted material facts.  The Loan Documents disclosed a teaser interest rate, but they did not disclose that this rate would sharply increase after only one month.  The Loan Documents disclosed a low monthly payment for the first 3-5 years of the loan, which was based on the teaser rate, but this did not reflect the actual amount of interest being charged or the amount Plaintiffs and Class Members actually owed each month.

28.     Plaintiffs and Class Members were not informed of the sharp increase in the interest rate, and the fact that their monthly payments were not enough to pay the interest accruing on the loan, until they had made multiple payments following the closing of the loan, at which time they would receive a statement showing that the principal balance had increased with each month that had passed since the loan closed, despite the fact that the borrower had made all payments as scheduled.  Had Plaza Home disclosed this material information, Plaintiffs and Class Members would not have purchased the subject Option ARM loans.

29.     By the time this material information was disclosed to Plaintiffs and Class Members, they were "locked" into the loan by a draconian prepayment penalty consisting of a prepayment charge equal to the interest rate that would accrue during a six-month period of the amount prepaid (if the prepayment amount was greater than 20% of the original principal amount stated in the Note), which was calculated at the rate of interest in effect under the terms of the Note at the time of the prepayment for a prepayment occurring during the first two to three years of the loan.  This draconian provision was designed by Defendants to deter and prevent anyone from refinancing the loan during the applicable time period.

30.     Before Plaintiffs and Class Members entered into the subject Plaza Home Option ARM loans, Defendant Plaza Home failed to disclose and concealed the amount by which the borrowers' loan balances would increase over the first two to three years of the loan, even though Defendant Plaza Home had actually performed this calculation internally and thus knew the truth.  This increase in the loan balance is material information to any consumer entering into these loans, because it effectively strips the homeowners of equity in their homes, and greatly impairs their ability to refinance these loans once

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

they recast to substantially higher monthly payments.  Thus, the loans were structured so that once borrowers were given or discovered the material information that their loans were negatively amortizing, Plaintiffs and Class Members could only get out of the loans if they incurred a substantial prepayment penalty, or waited two to three years, in which case they would have to refinance a substantially larger principal amount.  Had Defendant Plaza Home disclosed this material information, Plaintiffs and Class Members would not have purchased the subject Option ARM loans.

31.     Each subject Option ARM loan has so-called payment caps, which provide that, even after the monthly payment increases, it will not increase by more than 7.5% per year.  These payment caps are, however, subject to an overall cap on principal of 115% of the original loan amount.  Once the loan principal reaches this 115% cap, the 7.5% limitation on payment increases no longer applies, and the payment generally will increase by more than that amount.  This built-in "payment shock" is more than many Class Members can afford and was substantially certain to put them at risk of losing their homes to foreclosure.

32.     However, the most that Defendants' Loan Documents said about negative amortization was that it "may" occur.  This was ambiguous, misleading and deceptive, because it implies that negative amortization was subject to some future contingency, such as an increase in the index on which the adjustable rate was purportedly based, when, in fact, it was *guaranteed* to occur after only one month, even if the index stayed the same or went down.

33.     The undisclosed fact that negative amortization is certain to occur on the subject loans and information regarding the interest rate to be charged on the loan was information that Plaintiffs and Class Members would have found material when deciding whether to purchase the subject Option ARM loans.  Despite this, Defendant Plaza Home never disclosed to Plaintiffs and Class Members this material information.  Had Defendant Plaza Home disclosed this material information, Plaintiffs and Class Members would not have purchased the subject Option ARM loans.

34.     The failure of Defendants to disclose this material information in the Loan Documents violated TILA, state consumer protection statutes, and common law, as more fully set forth below.

/ / /

/ / /

11

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

**Defendant Countrywide's Participation In The Wrongful Conduct**

35.     From 2005 through 2007, Countrywide co-founder, Angelo R. Mozilo, along with Countrywide executives David Sambol and Eric P. Sieracki,[1] held Countrywide out as primarily a maker of prime quality mortgage loans, qualitatively different from competitors who engaged primarily in riskier lending. To support this false characterization, Mozilo, Sieracki and Sambol hid from consumers that Countrywide, in an effort to increase market share, engaged in an unprecedented loosening of its underwriting guidelines from 2005 and into 2007.  Specifically, Countrywide developed  "matching strategy," also known as the "supermarket strategy," where it attempted to offer any product that was offered by any competitor.  Countrywide's "supermarket strategy" was a key driver of the company's aggressive expansion of underwriting guidelines.  The strategy committed the company to offering any product and/or underwriting guideline available from at least one "competitor," which included sub-prime lenders.  Thus, if Countrywide did not offer a product offered by a competitor, Countrywide's production division invoked the matching strategy to add the product to Countrywide's menu.  For example, if Countrywide's minimum FICO score for a product was 600, but a competitor's minimum score was 560, the production division invoked the matching strategy to reduce the minimum required FICO score at Countrywide to 560.  The impact of the matching strategy was intensified by Countrywide's "no-brokering" policy, which precluded Countrywide's loan officers from referring loan applicants to other brokers and/or institutions.  Prior to its implementation, loan officers could engage in a practice known as "brokering," in which the loan officer would refer those borrowers deemed too risky for Countrywide to another lender, which in turn paid a commission to the Countrywide loan officer.  The no-brokering policy increased the incentives for Countrywide's retail sales force to be aggressive in finding ways for Countrywide to underwrite a loan, regardless of  whether the loan satisfied the underwriting guidelines Countrywide repeatedly touted to investors.

/ / /

---

[1]   Mozilo was Countrywide's co-founder, Chairman and CEO.  Sambol joined Countrywide in 1985 and became the Company's President and COO in September 2006.  Sambol served as Executive Managing Director for the Business Segment Operations from 2004 to 2006, Chairman and CEO of Countrywide from 2007 and President and COO of Countrywide Financial Corporation from 2004 through 2006. Sieracki served as Countrywide's Executive Managing Director and CFO and CFO of Countrywide Bank since April 2005 and was a member of the Executive Strategy Committee.

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

36.     The company's aggressive guideline expansion was deliberate, and began as early as 2003.  Indeed, from January 2003 until well into 2006, Countrywide's credit risk management department ("Risk Management") spent approximately 90% of its time processing requests for expansions of Countrywide's underwriting guidelines.

37.     By the end of 2006, Countrywide's underwriting guidelines were as loose as they had ever been, and Countrywide was writing riskier and riskier loans.  Even these expansive underwriting guidelines were not sufficient to support Countrywide's desired growth, so Countrywide wrote an increasing number of loans as "exceptions" that failed to meet its already loose underwriting guidelines even though exception loans had a higher rate of default. Acting as Countrywide's agent, Plaza Home and other originators marketed and sold these loan products to consumers without disclosing material information about the loans.

38.     At all times relevant, Countrywide concealed its ever-loosening underwriting and "exceptions" policies from Plaintiffs and Class Members, who were not told they were being assessed according to loosen underwriting standards or that they fell into exceptions.  Instead, Plaintiffs and Class Members reasonably believed they had qualified for the loan based on their ability to meet the financial obligations associated with the loan, and that it was, therefore, a loan they could afford.

39.     Countrywide originated, sold, and serviced both prime and subprime (which Countrywide's periodic filings referred to as "nonprime") mortgage loans.  By 2005, Countrywide was the largest mortgage lender in the United States, originating over $490 billion in mortgage loans in 2005, over $450 billion in 2006, and over $408 billion in 2007. Countrywide recognized pre-tax earnings of $2.4 billion and $2 billion in its loan production divisions in 2005 and 2006, respectively, and a pre-tax loss of $1.5 billion in its loan production division in 2007.

40.     Countrywide pooled most of the loans it originated, as well as loans it purchased from Plaza Home and other originators, and sold them in secondary mortgage market transactions. Countrywide sold the pooled loans either through whole loan sales or securitization.  In whole loan sales, Countrywide sold the loans to investors and recorded gains on the sales.  In securitizations, Countrywide sold interests in the pooled loans, i.e., mortgage-backed securities. Countrywide's loan sales were run out of its capital markets division. In 2005, Countrywide reported $451.6 million in

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

1   pre-tax earnings from capital market sales, representing 10.9% of its pre-tax earnings; in 2006, it

2   recognized $553.5 million in pre-tax earnings from that division, representing 12.8% of its pre-tax

3   earnings, and in 2007 it recognized a mere $14.9 million in pre-tax earnings from that division,

4   reporting a pre-tax loss overall.

5         41.   In 2005 and 2006, Countrywide's Option ARMs ranged between 17% and 21% of its

6   total loan originations.

7         42.   Mozilo, Sambol and Sieracki knew that the company was taking on increased risk of

8   defaults and delinquencies as a result of its loosened underwriting guidelines and matching strategy, yet

9   Countrywide concealed the unprecedented expansion of underwriting guidelines and the attendant

10  increased credit risk from borrowers.

11        43.   The risk for borrowers entering into Option ARM loans with Countrywide was foreseen

12  by Countrywide at least as early as September 2004.  Risk Management warned Countrywide's senior

13  officers that several aggressive features of Countrywide's guidelines (*e.g.*, high loan to value programs

14  and ARM loans) significantly increased Countrywide's credit risk, because borrowers would be unable

15  to repay the outstanding Option ARM loans.

16        44.   In one internal email, Mozilo referred to a particularly profitable sub-prime product as

17  "toxic," and in another he stated that the company was "flying blind," and had "no way" to predict the

18  performance of its heralded product, the Option ARM loan.  Mozilo believed that the risk was so high

19  and that the secondary market had so mispriced Option ARM loans that he repeatedly urged that

20  Countrywide sell its entire portfolio of those loans.  Mozilo urged this because he knew that Option

21  ARM borrowers, including Plaintiffs and the Class Members, would likely be unable to make monthly

22  payments on their loans once they reset to include all of the additional principal created by negative

23  amortization and to finally reflect the interest rates Countrywide was actually applying to the loans.

24        45.   Countrywide began originating Option ARM loans in 2004; by the second quarter of

25  2005, 21% of Countrywide's loan production consisted of ARM loans.  Because Countrywide began to

26  offer Option ARM loans in 2004, Countrywide's first wave of automatic resets due to recasting were

27  scheduled to occur in 2009.

28  / / /

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

46.     Not only did Countrywide not disclose material information about the Option ARM loans to Plaintiffs and Class Members, but it made affirmative misrepresentations about the product.  In fact, Countrywide publicly heralded Option ARM loans as a safe product offering. On May 31, 2006, Mozilo gave a speech in which he stated, "Pay-Option [ARM] loans represent the best whole loan type available for portfolio investment from an overall risk and return perspective," that "[t]he performance profile of this product is well understood because of its twenty year history, which includes stress tests in difficult environments[,]" and that Countrywide"actively manages credit risk through prudent program guidelines...and sound underwriting."

47.     In reality, contrary to such public statements extolling the virtues of the Option ARM loan product, Mozilo, along with several of Countrywide's senior executives, had internally concluded that the product's risks to the company were severe because the negative amortization feature caused a greater risk of borrower default, as shown by the following:

● On or about April 4, 2006, Mozilo sent an email to Sambol stating that "Since over 70% [of Option ARM borrowers] have opted to make the lower payment it appears that it is just a matter of time that we will be faced with much higher resets and therefore much higher delinquencies."

● On or about May 18, 2006, Mozilo sent another email to Sambol stating that "the Bank faces potential unexpected losses because higher [interest] rates will cause the loans to reset much earlier than anticipated and as a result causing mortgagors to default due to the substantial increase in their payments."

● On July 10, 2006, Mozilo belatedly requested that the company start informing new Option ARM borrowers of the dangers of negative amortization inherent in Countrywide's Option ARM loans and encouraging borrowers to make monthly payments that exceeded those identified in the TILDS.  However, this "request" did not result in any meaningful change in policy, and the unlawful Material Omissions continued.

Countrywide and its executives were thus scrambling to identify ways to mitigate these risks.  Mozilo, Sambol and Sieracki were aware of these concerns, but did nothing to alter the unlawful disclosures being provided to Plaintiffs and Class Members.

/ / /

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

48.     In June 2005, Countrywide Risk Management warned senior executives, including Sieracki, that action was needed to address the increasing pace of negative amortization and the potential for payment shock associated with Option ARM loans.  Specifically, in a June 28, 2005 meeting of the credit risk committee, which was attended by Sieracki, Risk Management recommended that the rate used to calculate the minimum payment on Option ARM loans be raised to reduce negative amortization and the severity of payment shock.  Risk Management explained that while the "teaser" rate remained constant at 1%, the short term rates (upon which borrowers' fully amortizing payments were based) had  risen steadily, thereby increasing the pace of negative amortization and the severity of the resulting payment shock.  Nevertheless, Countrywide did not materially change the disclosures it used and borrowers purchasing a Countrywide loan (whether directly from Countrywide or via its agent and co-conspirator, Plaza Home) continued to be subject to The Material Omissions alleged herein.

49.     Mozilo received more dire news regarding the Option ARM loan portfolio in June 2006.  On June 1, 2006, one day after he gave a speech publicly praising Option ARM loans, Mozilo sent an email to Sambol and other executives in which he reiterated his concern that in an environment of rising interest rates, resets were going to occur much sooner than scheduled, and because at least 20% of the Option ARM borrowers had FICO scores less than 700, borrowers "***are going to experience a payment shock which is going to be difficult if not impossible for them to manage***." Mozilo concluded that the company needed to act quickly to address these issues because "***[w]e know or can reliably predict what's going to happen in the next couple of years***." (Emphasis added.)  Despite this, Countrywide did nothing to correct Mozilo's prior misstatements regarding the product borrowers purchasing a Countrywide loan (whether directly from Countrywide or via its agent and co-conspirator, Plaza Home) continued to be subject to The Material Omissions alleged herein.

50.     On August 16, 2006, Mozilo received an e-mail from a fellow member of Countrywide's board of directors, asking whether the company anticipated any significant problems with the Option ARM loan portfolio.  Mozilo responded by reiterating the ongoing concerns he had shared with senior management earlier in 2006.  Mozilo explained that, as a result of rising interest rates, the loans would reset much faster than the borrowers expected with accompanying payment shock.  The only solution, Mozilo wrote, was to refinance the loans before reset, but this would be difficult in light of decreasing

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

1  home values, rising interest rates, and the draconian pre-payment penalties attached to the loan for the

2  first 2-3 years.  Mozilo wrote that only "unlikely" events, such as a dramatic rise in home values or a

3  dramatic drop in interest rates, would alleviate future payment shock.

4       51.    Mozilo met with Sambol the morning of September 25, 2006 to discuss the Option ARM

5  loan portfolio. The next day Mozilo sent an e-mail to Sambol and Sieracki expressing even greater

6  concern about the portfolio.  In that e-mail, Mozilo wrote:

7          [w]e have no way, with any reasonable certainty, to assess the real risk of

8          holding these loans on our balance sheet. The only history we can look to

9          is that of World Savings however their portfolio was fundamentally

10          different than ours in that their focus was equity and our focus is fico.  In

11          my judgement, as a long time lender, I would always trade off fico for

12          equity.  The bottom line is that we are flying blind on how these loans will

13          perform in a stressed environment of higher unemployment, reduced

14          values and slowing home sales.

15       52.    Mozilo never became comfortable with the risk presented by the Option ARM loan

16  products.  On November 3, 2007, Mozilo instructed other executives that he did not "want any more Pay

17  Options originated for [Countrywide]. *I also question whether we should touch this product going*

18  *forward because of our inability to properly underwrite these combined with the fact that these loans*

19  *are inherently unsound.*" (Emphasis added).  Finally, on November 4, 2007, Mozilo advised other

20  executives that "options [ARMs] have hurt the company and the Bank badly.... World Savings culture

21  permits them to make these loans in a sound manner and our culture does not .... fico scores are no

22  indication of how these loans will perform."

23       53.    When he described Option ARM loans as "inherently unsound," Mozilo was referring to

24  the fundamental truth - not disclosed to borrowers but known by Countrywide -  that the loans here at

25  issue are inherently fraudulent and unfair, as borrowers enter into the loans based upon the appearance

26  in the loan documents of extremely low interest rates and low payments, but are in fact designed to

27  feature high interest rates and, later, extremely high payments (much higher than would be required

28  under traditional mortgage loans), resulting in a much higher rate of defaults.

17

54.     Despite the repeated warnings of Mozilo and other executives, the clearly identified risks of Option ARM loans were not disclosed to consumers or borrowers and Countrywide (both directly and through Plaza Home, acting as its agent and co-conspirator) continued to sell new loans without correcting the Material Omissions.  Mozilo recognized as early as August 2006 that Option ARM loans were one of the "***only products left with margins [profit]***."

55.     At all relevant times, the subject Plaza Home Option ARM loans sold to Plaintiffs and many Class Members, and the documents provided them in conjunction with those loans, were devised and designed cooperatively by Countrywide and Countrywide's agents, including originators such as Plaza Home, as follows:

> a.     Countrywide is in the business of, among other things, securitizing home mortgage loans by packaging those loans into trusts or other vehicles in order to sell bonds to investors based on the income to be derived from those loans.
>
> b.     In order to increase the number of loans it could securitize, Countrywide and others devised a plan to have third party originators sell loans on its behalf.
>
> c.     At the same time, originators needed an outlet through which they could quickly dispose of the Option ARM loans they sold.  Originators earned income in connection with the issuance and re-sale of Option ARM loans, rather than in connection with servicing and holding those loans.  Because they needed to fund new Option ARM loans as they issued them and because the monies available to originators for that purpose were finite and needed to be regularly replenished, originators needed assurance that they would be able to promptly resell the Option ARM loans they originated to other institutions like Countrywide.
>
> d.     The originators agreed with Countrywide that the originators would sell certain Option ARM loans to homeowners.  Pursuant to that understanding and consistent with industry practice, on information and belief, originators funded those Option ARM loans using monies available to them through their warehouse lines of credit (often provided by Countrywide) or through other means, and Countrywide would then purchase the loans from the originators.  Under that arrangement, the

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

originators would collect fees from the homeowners to whom they sold the Option ARM loans as well as Countrywide, while Countrywide would collect revenues through the securitization process and in connection with servicing rights it retained on the loans after they were securitized.

e.      On information and belief Countrywide dictated the terms of, selected, pre-approved, and/or drafted loan and disclosure documents, including the documents at issue in this action, with the intention that they would be used and provided to Plaintiffs and Class Members in connection with Option ARM loans originators sold and/or originated.  Countrywide and the originators collectively approved the characteristics of the Option ARM loans the originators sold to Plaintiffs and Class Members.  In addition, Countrywide and the originators agreed that they would use the loan and disclosure documents that Countrywide selected, approved, and/or provided as a condition to Countrywide's purchase of those loans.

f.      Countrywide made the pre-approved loan and disclosure documents available to originators through document service companies, thereby allowing the originators to insert the material facts regarding Plaintiffs and Class Members into the pre-approved Countrywide loan documents, print the loan documents and provide them to Plaintiffs and Class Members.

g.      The originators' compliance with this process, including their use of pre-approved loan documents, was important to the originators' operations.  It was only by using the loan documents that had been written and/or pre-approved by Countrywide that the originators could be assured that they would be able to promptly resell the Option ARM loans they issued.

h.      The originators knew the contents of the loan documents they provided to Plaintiffs and Class Members and had the ability to ensure that those documents disclosed The Material Omissions.  Instead of providing Plaintiffs and Class Members with loan documents that complied with the requirements of TILA or

disclosed The Material Omissions, the originators chose to provide Plaintiffs and Class Members with the documents prepared, ratified, and approved by Countrywide.

  i.  On information and belief, Plaza Home entered into similar arrangements with additional lenders other than Countrywide, including WMMSC, who similarly dictated the terms of, selected, pre-approved, and/or drafted loan documents used by Plaza Home in connection with its sale of Option ARM loans in a manner substantially similar to that described above. Those other active participants, whose identities remain unknown to Plaintiffs, in this scheme are named herein as Does 5-10.

**Defendants WMMSC's and WAAC's Participation In The Wrongful Conduct**

  56.  At all relevant times, the subject Plaza Home Option ARM loans sold to Plaintiffs and many Class Members, and the documents provided them in conjunction with those loans, were devised and designed cooperatively by WMMSC and WMMSC's agents, including originators such as Defendant Plaza Home, as follows:

  a.  WMMSC was organized for the purpose of providing mortgage lending institutions with greater financing and lending flexibility by purchasing mortgage loans from such institutions and issuing mortgage-backed securities. WAAC is in the business of, among other things, securitizing home mortgage loans by packaging those loans into trusts or other vehicles in order to sell bonds to investors based on the income to be derived from those loans.

  b.  In order to increase the number of loans WAAC could securitize, WAAC and WMMSC devised a plan to have third party originators sell loans on their behalf.

  c.  At the same time, originators needed an outlet through which they could quickly dispose of the Option ARM loans they sold. Originators earned income in connection with the issuance and re-sale of Option ARM loans, rather than in connection with servicing and holding those loans. Because they needed to fund new Option ARM loans as they issued them and because the monies available to

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

originators for that purpose were finite and needed to be regularly replenished, originators needed assurance that they would be able to promptly resell the Option ARM loans they originated to other institutions like WMMSC.

d.   The originators agreed with WMMSC that the originators would sell certain Option ARM loans to homeowners.  Pursuant to that understanding and consistent with industry practice, on information and belief, originators funded those Option ARM loans using monies available to them through their warehouse lines of credit (often provided by WMMSC) or through other means, and WMMSC would then purchase the loans from the originators.  Under that arrangement, the originators would collect fees from the homeowners to whom they sold the Option ARM loans as well as from WMMSC, while WMMSC would collect revenues in connection with the servicing rights it also purchased pursuant to the purchase agreement.  WAAC would collect revenues through the securitization process.

e.   WMMSC's Seller Guide ( the "Seller Guide") requires that the seller of the Option ARM loans (*i.e.,* originators such as Plaza Home) must have a quality control program which enables the seller and WMMSC to determine whether the seller's mortgage loan origination, underwriting, closing and delivery procedures meet all of WMMSC's requirements.

f.   The Seller Guide also requires that the seller underwrite each mortgage loan in compliance with the applicable guidelines provided in the Seller Guide or the seller's own guidelines provided that they have been approved by WMMSC, and with all applicable governing statutes and regulations, including but not limited to, the Truth in Lending Act, Equal Credit Opportunity Act, Consumer Credit Protection Act, Fair Credit Reporting Act, Real Estate Settlement Procedures Act, and Home Mortgage Disclosure Act.

g.   The Seller Guide instructs sellers to follow "prudent underwriting practices" with the following points in mind:

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

i.      The applicant's credit and the subject property must be carefully evaluated;

ii.     Mortgage loans and lending practices must comply with all local, state and federal laws and regulations affecting the seller;

iii.    The seller must have a quality control program which ensures that each mortgage loan meets all applicable underwriting standards and the seller can make all the requisite representations and warranties for each mortgage loans; and

iv.    Mortgage loans submitted for purchase should be representative of the seller's overall portfolio and be acceptable to other institutional investors investing in mortgage loans secured by property in the area.

h.     According to the August 23, 2005 Prospectus, WMMSC's underwriting standards are intended to evaluate the prospective mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed mortgaged property as collateral.  In the loan application process, WMMSC required prospective mortgagors to provide information regarding factors such as their assets, liabilities, income, credit history, employment history and other related items. Thus, WMMSC dictated the information that was required from loan applicants applying for Option ARM loans from originators such as Plaza Home that WMMSC would subsequently purchase and then sell to WAAC to be securitized.

i.     The Seller Guide also required sellers (*i.e.*, originators such as Plaza Home), to use mortgage loan documents which comply with WMMSC's applicable requirements, as well as all applicable federal, state, and local laws and regulations.  The Seller Guide states that WMMSC will not purchase any mortgage loan which was originated or closed with documents which are not specifically authorized in the Seller Guide or approved by WMMSC in writing.

22

j.   Thus, WMMSC dictated the terms of, selected, pre-approved, and/or drafted loan and disclosure documents, including the documents at issue in this action, with the intention that they would be used and provided to Plaintiffs and Class Members in connection with Option ARM loans originators sold and/or originated.  WMMSC and the originators collectively approved the characteristics of the Option ARM loans the originators sold to Plaintiffs and Class Members.  In addition, WMMSC and the originators agreed that the originators would use the loan and disclosure documents WMMSC selected, approved, and/or provided as a condition to WMMSC's purchase of those loans.

k.   WMMSC made the loan and disclosure documents it dictated the terms of, selected, pre-approved, and/or drafted  available to originators through document service companies, thereby allowing the originators to insert the material facts regarding Plaintiffs and Class Members into the WMMSC loan documents, print the loan documents and provide them to Plaintiffs and Class Members.

l.   The originator's compliance with this process, including their use of pre-approved loan documents, was important to the originators' operations.  It was only by using the loan documents that had been pre-approved by WMMSC that the originators could be assured that they would be able to promptly resell the Option ARM loans they issued.

m.   The originators knew the contents of the loan documents they provided to Plaintiffs and Class Members and had the ability to ensure that those documents disclosed The Material Omissions.  Instead of providing Plaintiffs and Class Members with loan documents that complied with the requirements of TILA or disclosed The Material Omissions, the originators chose to provide Plaintiffs and Class Members with the documents prepared, ratified, and approved by WMMSC.

n.   On information and belief, Plaza Home entered into similar arrangements with additional lenders other than WMMSC, including Countrywide, who similarly

23

dictated the terms of, selected, pre-approved, and/or drafted loan documents used by Plaza Home in  connection with its sale of Option ARM loans in a manner substantially similar to that described above.  Those other active participants, whose identities remain unknown to Plaintiffs and who also dictated the terms of, pre-approved, and/or drafted the loan forms used by Plaza Home, in this scheme are named herein as Does 5-10.

57.   The loan characteristics described above were true of the named Plaintiffs' loans and were also common characteristics of the loan forms used by Defendants during the liability period.  It is these loan forms (the Loan Documents) that are the subject of this Complaint.

58.   At all relevant times, Defendants, and each of them, actively and knowingly participated and/or aided and abetted each other in this systematic scheme and otherwise conspired to sell the subject Option ARM loans as alleged herein.  Defendants initiated this scheme in order to maximize the amount of the loans issued to consumers and to maximize Defendants' profits, irrespective of the increased risks to consumers posed by such loans.

**V.**

**CLASS ACTION ALLEGATIONS**

59.   Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Federal Rule of Civil Procedure, Rules 23(a) and 23(b).  The Classes that Plaintiffs seek to represent are defined as follows:

**National TILA Class:**  All individuals in the United States of America who, within the one-year period preceding the filing of Plaintiffs' original complaint through the date notice is mailed to the Class, obtained an Option ARM loan on their home from Defendant Plaza Home Mortgage, Inc., with the following characteristics: (i) the Monthly Payment Amount stated in the Note is based upon the low "teaser" interest rate which ranges from 1% to 3%; (ii) the payment schedule in the TILDS, for the first year or more of the Note, is based upon a fully amortizing payment at the "teaser" interest rate; (iii) the interest rate "adjusts" after only one month

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

to a rate which is the sum of the "index" and the "margin"; and (iv) after the first three to five years of the loan, the Monthly Payment Amount increases to a fully amortizing payment based upon the remaining principal balance at that time.  Excluded from the National Class are Defendants' employees, officers, directors, agents, representatives, and their family members, as well as the Court and its officers, employees, and relatives.

**The California Class:**  All individuals who, within the four-year period preceding the filing of Plaintiffs' original complaint through the date that notice is mailed to the Class, have or had an Option ARM loan originated or sold by Defendant Plaza Home Mortgage, Inc. that: (a) was  secured by real property in the United States; and (b) was originated or otherwise approved by Defendant Plaza Home Mortgage, Inc. within the State of California.  Excluded from the California Class are Defendants' employees, officers, directors, agents, representatives, and their family members, as well as the Court and its officers, employees, and relatives.

Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time, or to propose or eliminate sub-classes in response to facts learned through discovery or legal arguments advanced by Defendants or otherwise.

60.    Numerosity:  The National TILA Class and the California Class are so numerous that the individual joinder of all members thereof  is impracticable under the circumstances of this case.  While the exact number of class members is unknown at this time, Plaintiffs are informed and believe that each of the proposed classes consists of hundreds or thousands of members.

61.    Commonality:  Common questions of law or fact are shared by Class Members.  This action is suitable for class treatment, because these common questions of fact and law predominate over any individual issues.  Such common questions include, but are not limited to, the following:

(a)    Whether the Loan Documents violated TILA;

(b)    Whether the Loan Documents violated 12 C.F.R. § 226.17;

1       (c)     Whether the Loan Documents violated 12 C.F.R. § 226.19;

2       (d)     Whether Defendants engaged in unfair and/or fraudulent business practices that

3              were likely to deceive Plaintiffs and Class Members before and during the loan

4              application process;

5       (e)     Whether Defendants concealed, omitted and/or otherwise failed to disclose

6              information they were mandated to disclose under TILA, state consumer

7              protection statutes, and/or the common law;

8       (f)     Whether Defendants failed to disclose to Plaintiffs and Class Members, before

9              they entered into the subject Option ARM loans, that negative amortization was

10             certain to occur if the borrowers made the initial minimum monthly payments;

11      (g)     Whether WMMSC, WAAC, Countrywide, and other subsequent purchasers

12            and/or assignees are liable for Plaza Home's violations of TILA as alleged herein;

13      (h)     Whether the Loan Documents are non-negotiable instruments;

14      (i)     Whether Defendants' failures to disclose material information, as alleged herein,

15            are apparent on the face of the Loan Documents;

16      (j)     Whether WMMSC, WAAC and Countrywide are liable for the fraudulent

17            omissions and UCL violations alleged herein;

18      (k)     Whether WMMSC, WAAC, Countrywide and others, knowingly assisted and

19            aided and abetted Plaza Home in its scheme to sell Option ARM loans to

20            Plaintiffs and Class Members without disclosing the material information

21            described herein;

22      (l)     Whether Plaintiffs and Class Members are entitled to damages;

23      (m)    Whether Plaintiffs and Class Members are entitled to punitive damages; and

24      (n)     Whether Defendants' affirmative defenses, if any, raise common issues of fact or

25            law as to Plaintiffs and Class Members as a whole.

26     62.    Typicality:  Plaintiffs' claims are typical of the claims of absent Class Members.

27 Plaintiffs and the other Class Members were subjected to the same kind of unlawful conduct and the

28 claims of Plaintiffs and the other Class Members are based on the same legal theories.

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

63. <u>Adequacy</u>: Plaintiffs are adequate representatives of each of the classes, because their interests do not conflict with the interests of the other members of the classes Plaintiffs seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation and Plaintiffs intend on prosecuting this action vigorously. The interests of Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

64. <u>Ascertainable Class</u>: The proposed classes are ascertainable in that the members can be identified and located using information contained in Defendants' mortgage lending records.

65. This case is brought and can be maintained as a class action under Rule 23(b)(1), 23(b)(2), and 23(b)(3):

(a) <u>Injunctive and/or Declaratory Relief to the Class is Appropriate</u>: Defendants, and each of them, have acted or refused to act on grounds generally applicable to each of the Classes, thereby making final injunctive relief or corresponding declaratory relief with respect to each class as a whole appropriate; and

(b) <u>Predominant Questions of Law or Fact</u>: Questions of law or fact common to all Class Members, including those identified above, predominate over questions affecting only individual Class Members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require. Moreover, absent class treatment of this controversy, the amount of individual Class Members' losses in comparison to the enormous cost of litigation makes it almost certain that few Class Members would ever be able to even seek, let alone obtain, redress for their injuries.

/ / /

/ / /

/ / /

/ / /

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

# VI.

## FIRST CAUSE OF ACTION

### Violations of Truth in Lending Laws, 15 U.S.C. §1601, *et seq.*

### (Against All Defendants)

66.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

67.     Defendant Plaza Home violated TILA through The Material Omissions by:  (1) failing to disclose that negative amortization was certain to occur; (2) establishing a payment schedule that was not based on the annual percentage rate (APR), but rather an interest rate that applied for at most only 30 days; (3) listing in the TILDS an APR having no relation to the monthly payment listed for the first two to five years; (4) failing to disclose that the initial interest rate listed in the Note was discounted; and (5) failing to disclose the certainty of negative amortization in the Loan Documents provided to Plaintiffs and Class Members before they entered into the Loan Documents.

68.     15 U.S.C. § 1641(a) provides for assignee liability for violations that are apparent on the face of the loan documents."  The violations of TILA and Regulation Z alleged in this Complaint are apparent on the face of the loan documents.  As a result, as purchasers and assignees of Plaintiffs' and Class Members' loans, WMMSC, WAAC and Countrywide are responsible and answerable for the violations alleged in this Cause of Action.

**A.      Failure to Disclose That Negative Amortization Was Certain to Occur.**

69.     12 C.F.R. § 226.19 sets forth additional specific disclosure requirements for residential home loans, stating as follows:

> 226.19.  Certain residential mortgage and variable-rate transactions. . . .
> (b) Certain variable-rate transactions.  If the annual percentage rate may increase after consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year, the following disclosures must be provided at the time an application form is provided or before the consumer pays a non-refundable fee, whichever is earlier. . .
> (vii) *Any rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment limitations, negative amortization, and interest rate carryover*. (Emphasis added.)

70.     In 1995, and continuing each time new Official Staff Commentary was issued, the Federal Reserve Board ("FRB") made clear that when a loan was a variable rate loan with payment

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

caps, such as those that are the subject of this lawsuit, the disclosure requires a definitive statement about negative amortization:

> **12 CFR Part 226**
> **[Regulation Z; Docket No. R-0863]**
> **Monday, April 3, 1995**
> **AGENCY: Board of Governors of the Federal Reserve System.**
> **ACTION: Final rule; official staff interpretation.**
> **If a consumer is given the option to cap monthly payments**
> **that may result in negative amortization, the creditor must**
> **fully disclose the rules relating to the option, including the**
> **effects of exercising the option** *(such as negative*
> *amortization will occur and the principal balance will*
> *increase)*… (Found at 12 C.F.R. Pt. 226, Supp. I,
> 19(b)(2)(vii)-2 (emphasis added).

71.     At all times relevant, statutory and common law in effect make it unlawful for a lender, such as Defendants, to fail to comply with the FRB's Official Staff Commentary as well as Regulation Z and TILA.

72.     Defendants were aware, or should have been aware, that this loan product had a variable rate with payment caps and that the Loan Documents omitted The Material Omissions, defined above, including that negative amortization was a certainty.  On information and belief, Defendants were aware of the guaranteed negative amortization, because they accrued the negative amortization as income for accounting and/or tax purposes.  Defendants were also aware the negative amortization was certain to occur, because, in computing the total finance charge payable over the full life of the loan for purposes of compiling the TILDS, they included the interest on "deferred interest" which would accrue because the scheduled payments were insufficient to pay all interest due on the loan.  The TILDS, however, did not disclose the fact that negative amortization was a certainty, or the amount of the total finance charge that resulted from this negative amortization.

73.     The only places in the Notes that even inferentially reference negative amortization suggest that negative amortization is only a mere possibility, rather than an absolute certainty.  For instance, the Notes, at ¶ 3(E) stated that the borrower's "Minimum Payment ***could*** be less than or greater than the amount of the interest portion of the monthly payment"(emphasis added), which was a half-truth, because it did not state that the payment schedule provided would absolutely guarantee that negative amortization was going to occur on these loans.

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

74.    Had Defendant Plaza Home disclosed to Plaintiffs and the Class members that negative amortization was certain to occur if the payment schedule in the TILDS was followed, Plaintiffs and the Class members would not have entered into the loans.

**B.    Failure to Disclose the Interest Rate Underlying the Payment Schedule.**

75.    Additionally, 12 C.F.R. §§ 226.17 and 226.19 require the lender to make disclosures concerning the payments in a clear and conspicuous manner.  A misleading disclosure is as much a violation of TILA as a failure to disclose at all.

76.    The scheduled payment amounts and interest rate listed in the Note and TILDS for each of the subject loans are unclear, because the payment amounts for the first three to five years are not based on the APR listed in the TILDS, but, instead, are based upon a rate listed in the Note that Defendants knew would exist for only thirty (30) days.  At all times relevant, the Loan Documents failed to disclose that even if Plaintiffs and Class Members made payments according to the payment schedule set forth in the TILDS, negative amortization was an absolute certainty.  Had Defendant Plaza Home clearly and conspicuously disclosed the payment amount sufficient to cover both principal and interest based upon the index and margin that would be used to calculate the payments after the first month, the payment amounts would have been approximately double the payment amounts listed.

77.    Official Staff Commentary to 12 C.F.R. § 226.17(a)(1) states:  "This standard requires that disclosures be in a reasonably understandable form.  For example, while the regulation requires no mathematical progression or format, the disclosures must be presented in a way that does not obscure the relationship of the terms to each other…"

78.    At all times relevant, the Loan Documents of the Defendants violated 12 C.F.R. § 226.17(a)(1) in that the relationship between the payments, for up to the first five years of the loans, bear no relationship to the APR listed in the TILDS.  Therefore, the form of disclosure used by Defendant Plaza Home obscured the relationship between the interest rate listed in the Notes and the APR listed in the TILDS and the monthly payments listed in the payment schedule.

**C.    Failure to Disclose That the Initial Interest Rate Was Discounted**.

79.    12 C.F.R. § 226.17(c)(1) requires that "[t]he disclosures shall reflect the terms of the legal obligation between the parties."  Official Staff Commentary regarding 12 C.F.R. § 226.17(c)(1)

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

1    requires that "[t]he disclosures shall reflect the credit terms to which the parties are legally bound as of

2    the outset of the transaction.  In the case of disclosures required under  § 226.20(c), the disclosures shall

3    reflect the credit terms to which the parties are legally bound when the disclosures are provided."  The

4    Official Staff Commentary further states that "[t]he legal obligation normally is presumed to be

5    contained in the note or contract that evidences the agreement."  Official Staff Commentary to 12 C.F.R.

6    § 226.17(c)(1) states that "[i]f a loan contains a rate or payment cap that would prevent the initial rate or

7    payment, at the time of the first adjustment, from changing to the rate determined by the index or

8    formula at consummation, the effect of that rate or payment cap should be reflected in the disclosures."

9        80.    At all times relevant during the liability period, the Loan Documents violated 12 C.F.R. §

10   226.17(c) in that the Notes and TILDS did not disclose that the liability that Plaintiffs and Class

11   Members were incurring was substantially greater than the amount of their scheduled payments.

12   Further, Defendant Plaza Home failed to disclose to Plaintiffs and Class Members that the initial interest

13   rate was discounted, and that it was absolutely certain to substantially increase after only one month,

14   even when the index did not rise.  To the extent that Defendants did in any way provide a disclosure that

15   stated that the initial payment was not based on the index, they failed to do so in a manner that was clear

16   and conspicuous, and that did not obscure its importance, or that was designed to be reasonably

17   understood by the ordinary consumer.  Rather than disclose that the interest rate would increase after

18   only one month, the Loan Documents stated that the initial payment was based on a "yearly rate" of 1-

19   3%.  The Loan Documents did not clearly and unambiguously disclose that this initial rate was

20   discounted, and would only last for one month.

21        **D.**    **Failure to Clearly and Conspicuously Disclose the Actual Interest Rate.**

22        81.    Defendant Plaza Home also failed to disclose to Plaintiffs and Class Members before

23   they entered into the subject Option ARM loans all of the ways by which the interest rate applicable to

24   the subject loans could increase, in violation of TILA.

25        82.    The foregoing violated 15 U.S.C. § 1638(a)(4), which requires lenders to disclose only

26   one annual percentage rate ("APR") and not an additional APR that is only applicable for the first 30

27   days of a loan.

28   / / /

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

83.     It also violates the FRB's Commentary to 12 C.F.R. § 226.(17)(C)-6 requires that the APR must "reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation."

84.     It violates 15 U.S.C. § 1638(a)(8) and 12 C.F.R. § 226.18(e), which requires lenders to provide a descriptive explanation of the APR, which is defined as the cost of credit expressed as a yearly rate.

85.     It violates 12 C.F.R. § 226.17 (and the commentary thereto) and 12 C.F.R. § 226.19, which, together, require lenders to make disclosures concerning the APR in a clear and conspicuous manner; under TILA, a misleading disclosure is as much a violation of TILA as a failure to disclose at all.

86.     At all times relevant during the liability period, Defendant Plaza Home provided Plaintiffs and Class Members with Notes that state:   "I will pay interest at a yearly rate of [1.000% - 3.000%].  The interest rate I will pay may change.  The interest rate required by this [section] is the rate I will pay both before and after any default described in Section 7(B) of this Note."  However, in the TILDS, the box entitled "ANNUAL PERCENTAGE RATE" describes the APR as "[t]he cost of your credit as a yearly rate" and then lists a much higher APR than the rate listed in the Notes.  For instance, in the case of Plaintiff Amparan, it listed an APR of "7.136" and for Plaintiffs Rafael and Guadalupe Cisneros, it listed an APR of "8.312."

87.     For Plaintiff Amparan, the "1.500%" stated in the Note contradicts the "7.136%" APR that Defendant Plaza Home stated in the TILDS.  And for Plaintiffs Rafael and Guadalupe Cisneros, the "1.750%" stated in the Note contradicts the "8.312%" APR that Defendants stated in the TILDS.

88.     At all times relevant during the liability period, Defendant Plaza Home failed to clearly and conspicuously explain in the Note or TILDS that the low rate or APR (the same rate upon which Defendants based the written payment schedules provided to Plaintiffs and Class Members) was offered only for the first thirty (30) days of the loan.

89.      Defendant Plaza Home also failed to disclose to Plaintiffs and Class Members that the APR listed in the TILDS was not the APR used to determine the first five years of payments listed in the

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

1   very same TILDS, and that the listed payment amounts for the first five years of the loan were based on

2   the interest rate stated in the Note, an interest rate which  was correct for no more than thirty days.

3          90.    The FRB's commentary to 12 C.F.R. § 226.17(C)-6 requires that the APR must "reflect a

4   composite annual percentage rate based on the initial rate for as long as it is charged and, for the

5   remainder of the term, the rate that would have been applied using the index or formula at the time of

6   consummation."  Additionally,

7              in a variable-rate transaction with a...discounted or premium rate,
               disclosures should not be based solely on the initial terms.  In those
8              transactions, the disclosed annual percentage rate should be a composite
               rate based on the rate in effect during the initial period and the rate that is
9              the basis of the variable-rate feature for the remainder of the term.

10         91.     The reason for this requirement is clear.  Consumers cannot make an informed decision

11  when they cannot compare the cost of credit to other proposals.  It therefore was incumbent upon

12  Defendants to disclose to Plaintiffs and the Class members *before* they entered into the subject Option

13  ARM loans the composite interest rate, and the amount of payments based thereon, so that these

14  borrowers could understand exactly what they would be paying for the loan.

15         92.    For Defendants who are in the business of making, purchasing and securitizing loans, the

16  violations of TILA and Regulation Z described in this Complaint are objectively and  reasonably

17  apparent on the face of the documents provided to Plaintiffs and Class Members, because the disclosures

18  provided can be determined to be incomplete and inaccurate by a comparison among the TILDS, the

19  other disclosure statements, and the Note described herein.

20         93.    As a direct and proximate result of Defendants' violations of TILA and its implementing

21  regulations, Plaintiffs and Class Members have suffered injury in an amount to be determined at the time

22  of trial.

23         94.    WHEREFORE, Plaintiffs and Class Members are entitled to an order declaring that

24  Defendants violated TILA, 15 U.S.C. §1601, *et seq*., that Plaintiffs Rafael and Guadalupe Cisneros and

25  the similarly situated Class members are entitled to statutory damages pursuant to 15 U.S.C. § 1640,

26  attorneys fees, litigation costs and expenses and costs of suit, for an order rescinding Plaintiffs'

27  mortgages, and for an order awarding other relief as the Court deems just and proper.

28  / / /

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

# VII.

## SECOND CAUSE OF ACTION

### Fraudulent Omissions

### (Against All Defendants)

95.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

96.    As alleged above, under TILA, Defendant Plaza Home had a duty to clearly and conspicuously disclose to Plaintiffs and each Class Member before they entered into the subject Option ARM loans: (i) the payment schedule for the first three to five years was not based upon the APR listed on the TILDS, (ii) that negative amortization would occur and that the "principal balance will increase"; (iii) that the initial interest rate on the note was discounted; and (iv) the applicable annual percentage rate ("APR").

97.    Under common law, Defendant Plaza Home further had a duty to disclose to Plaintiffs, and Class Members that: (i) the promised low interest rate was only available for thirty days if at all; (ii) the payment rate for the first three to five years provided to Plaintiffs and Class Members on the TILDS was insufficient to pay both principal and interest; (iii) negative amortization was absolutely certain to occur if Plaintiffs and Class Members made payments according to the payment schedule provided by Defendants; and that (iv) loss of equity and/or loss of Plaintiffs' and Class Members' residences was certain to occur if Plaintiffs and Class Members made payments according to the payment schedule provided by Defendants.

98.    Plaza Home is liable under this Cause of Action because it was the originator of the Plaintiffs' loans and provided the deficient loan documents and disclosures to Plaintiffs and Class Members while concealing and omitting material information as alleged herein. WMMSC, WAAC and Countrywide are liable under this Cause of Action (1)  as a result of their participation in a scheme wherein they provided Plaza Home with the deficient loan documents and disclosures, and directed Plaza Home to use those disclosures, despite The Material Omissions, (2)  to the degree they provided the deficient loan documents and disclosures to Plaintiffs and Class Members directly, and (3) because they are also responsible as purchasers and assignees of Plaintiffs' and Class Members' loans.

/ / /

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

99.     Each of the Notes at issue states:  "I will make a payment every month" [and] "I will make these payments every month until I have paid all the **Principal and Interest** and any other charges described below that I owe under this Note."   (Emphasis added.)  The Note then states, while referencing the Payment Cap provision, that "[t]his Payment Cap applies only to the **Principal and Interest** payment ..."  And, under the heading "BORROWERS FAILURE TO PAY AS REQUIRED," the Note states "[t]he amount of the charge will be 5.000% of my overdue payment of **Principal and Interest**." (Emphasis added.)   These partial representations failed to disclose that the payment amounts prescribed in the Loan Documents were certain to result in negative amortization.

100.    The Notes further state: "**If** the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur." (emphasis added).  However, the Loan Documents fail to disclose the material fact that the payment schedules provided by Defendants in the TILDS could not possibly cover the amount of interest due under *any* conceivable index rate plus the margin after the first 30 days.   To be accurate and complete, the Notes should have disclosed that if the borrowers followed the payment schedules set forth by Defendants, the Monthly Payments *would not* cover the amount of interest due and negative amortization *would in fact* occur.

101.    The Notes further state, "my Minimum Payment **could be less** than or greater than the amount of the amount of the interest portion of the monthly payment..."  (emphasis added).  And, under "Payment Options" the Notes state: "Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment..."  However, the so-called "Payment Options" that the lender "may provide" were not disclosed to Plaintiffs and Class members *before* they entered into the subject Option ARM loans; rather, it was only after Plaintiffs and Class Members entered into the loans that they were provided crucial material information about the true cost of their loans, and by then, it was too late as the borrowers were already hooked into the loans, with their accompanying heavy prepayment penalties.

102.    The Notes list an interest rate and a payment amount based on that initial interest rate. However, the TILDS that Defendants gave to Plaintiffs and Class Members before they entered into the subject loans included a schedule of payments (including that initial payment rate) but disclosed a different, much higher interest rate.  By stating the low teaser rate and associated monthly payment in

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

1    the Note, and stating the much higher interest rate in the TILDS accompanied by a payment schedule

2    based on the low teaser rate, Defendants failed to disclose the actual interest costs that borrowers were

3    going to accrue on their loans.

4         103.    The Notes further state, under "Amount of My Initial Monthly Payments" "Each of my

5    initial monthly payments until the first Payment Change Date will be ...." and then, under "Payment

6    Change Dates" it states "My monthly payment *may* change..."  (emphasis added).  However, under the

7    terms of the subject Option ARM loan, Plaintiffs' and Class Member's loan "payment" was *absolutely*

8    *guaranteed to go up the very next month*.   In particular, Defendants' Loan Documents failed to disclose

9    and omitted the material fact that while the initial monthly payment amount would remain constant, the

10   actual amount to pay for the loan was absolutely guaranteed to go up.

11        104.    Defendants purposefully and intentionally devised this Option ARM loan scheme of

12   stating only partially true facts and omitting important material information in order to deceive

13   consumers into believing that these loans would provide a low-interest rate loan for the first two (2) to

14   five (5) years of the Note and that if they made their payments according to the payment schedule

15   provided by Defendants their payments would be sufficient to pay both principal and interest.

16        105.    Defendants designed, created, supplied, or were aware of the TILDS which set forth low

17   payments for the first two to five years of the loan.   Defendants further knew, but did not clearly

18   disclose, that these listed low payments in the TILDS were predicated on an interest rate which would

19   not, in fact, exist after the first thirty days.  Defendants knew, but did not disclose, that negative

20   amortization was *guaranteed* if borrowers made these listed low payments.   Defendants further knew,

21   but did not disclose, that the listed payments set forth in the TILDS were calculated such that, if the

22   payments were made, borrowers actually would be paying off 110% or 115% of the original principal

23   balance.   This information was material to any reasonable borrower, and the omission of such material

24   information would cause a reasonable borrower to believe that the fully amortizing payments shown on

25   the TILDS were in fact those payments necessary to pay off the balance of the original amount financed

26   (*i.e.*, the original principal balance less principal payments made on account of that balance), rather than

27   115% of the amount financed.   Defendant Plaza Home could have easily disclosed, and should have

28   accurately and clearly disclosed, that if borrowers paid the remaining payments listed on the TILDS they

1  would in fact be paying 115% of the balance of the original financed amount, rather than merely the

2  balance of the original amount financed.   But Plaza Home chose not to do so in furtherance of their

3  scheme as alleged herein.

4       106.   At all times relevant, Defendants had exclusive knowledge of these materials facts, but

5  actively concealed the material facts from Plaintiff and Class Members.

6       107.   The omitted information, as alleged herein, was objectively material to both the interest

7  rate and the amount of payments, which are the two most important features of any mortgage loan.  Had

8  Defendants disclosed this information, Plaintiffs and Class Members would not have purchased the loan

9  products.

10      108.   As a direct and proximate result of Defendants' failures to disclose and omission of

11  material facts, as alleged herein, Plaintiffs and Class Members have suffered damages, which include,

12  but are not limited to the loss of equity Plaintiffs and each Class Member had in their homes prior to

13  entering these loans.

14      109.   The wrongful conduct of Defendants, as alleged herein, including Defendants' placing of

15  their corporate and/or individual profits over the rights of others, was willful, oppressive, immoral,

16  unethical, unscrupulous, substantially injurious, malicious and in conscious disregard for the well being

17  of Plaintiffs and Class Members, and particularly vile, base, contemptible, and wretched.  Such acts

18  and/or omissions were performed on the part of officers, directors, and/or managing agents of each

19  corporate defendant and/or taken with the advance knowledge of the officers, directors, and/or

20  managing agents who authorized and/or ratified said acts and/or omissions.  Defendants thereby acted

21  with malice and complete indifference to and/or conscious disregard for the rights and safety of others,

22  including Plaintiffs and the general public.  Accordingly, Plaintiffs and Class Members are entitled to an

23  award of punitive damages against Defendants in an amount to deter them from similar conduct in the

24  future.

25      110.   WHEREFORE, Plaintiffs and Class Members are entitled to all legal and equitable

26  remedies provided by law, including but not limited to actual damages, exemplary damages,

27  prejudgment interest and costs.

28  / / /

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

1

**VIII.**

2

**THIRD CAUSE OF ACTION**

3

**Violation of California's Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et. seq.***

4

**"Unlawful," "Unfair" and "Fraudulent" Business Acts or Practices**

5

**(Against All Defendants)**

6

111.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

7

112.    Plaintiffs bring this cause of action on behalf of themselves, on behalf of the Class

8

Members, and in their capacity as private attorneys general against all Defendants for their unlawful,

9

unfair, fraudulent and/or deceptive business acts and/or practices pursuant to the California Business &

10

Professions Code section 17200, *et seq.* ("UCL") which prohibits all unlawful, unfair and/or fraudulent

11

business acts and/or practices.

12

113.    Plaintiffs assert these claims as they are representatives of an aggrieved group and as

13

private attorneys general on behalf of the general public and other persons who have expended funds

14

that the Defendants should be required to pay or reimburse under the restitutionary remedy provided by

15

California Business & Professions Code §§ 17200, *et seq.*

16

114.    The instant claim is predicated on the generally applicable duty of any contracting party

17

to not omit material facts, and on the duty to refrain from unlawful, unfair and deceptive business

18

practices.  Plaintiffs and Class Members hereby seek to enforce a general proscription of unfair business

19

practices and the requirement to refrain from deceptive conduct.  The instant claim is predicated on

20

duties that govern anyone engaged in any business and anyone contracting with anyone else.

21

115.    Plaintiffs and Class Members were consumers who applied for a mortgage loan through

22

Defendants.  During the loan application process, in each case, Defendant Plaza Home uniformly failed

23

to disclose and omitted material information that was known only to Defendants and that could not

24

reasonably have been discovered by Plaintiffs and Class Members as set forth in the preceding causes of

25

action.

26

116.    Based on The Material Omissions and Defendants' other partially true statements and

27

failures to disclose as alleged herein, Plaintiffs and Class Members agreed to finance their homes

28

through the subject Option ARM loans, and have been actually harmed.

117.    Defendants intended that Plaintiffs and Class Members would be misled into believing that, if they made payments based on the payment schedules provided to them before they entered into the subject loan, the principal balance would be reduced with each payment when it actually increased with each payment.  The Loan Documents were designed and used for this purpose.

118.    Defendants designed, created, supplied, or were aware of the TILDS which set forth low payments for the first two to five years of the loan.   Defendants further knew, but did not clearly disclose, that these listed low payments in the TILDS were predicated on an interest rate which would not, in fact, exist after the first thirty days.  Defendants knew, but did not disclose, that negative amortization was *guaranteed* if borrowers made these listed low payments.   Defendants further knew, but did not disclose, that the listed payments set forth in the TILDS were calculated such that, if the payments were made, borrowers actually would be paying off 115% of the original principal balance. This information was material to any reasonable borrower, and the omission of such material information would cause a reasonable borrower to believe that the fully amortizing payments shown on the TILDS were in fact those payments necessary to pay off the balance of the original amount financed (*i.e.*, the original principal balance less principal payments made on account of that balance), rather than 115% of the amount financed.  Defendants could have easily disclosed, and should have accurately and clearly disclosed, that if borrowers paid the remaining payments listed on the TILDS they would in fact be paying 115% of the balance of the original financed amount, rather than merely the balance of the original amount financed.   But Defendants chose not to do so in furtherance of their unfair and misleading scheme.

119.    By engaging in the above-described acts and practices, Defendants, and each of them, have committed one or more acts of unfair competition within the meaning of California Business & Professions Code §§ 17200, *et seq*.

120.    Defendants' misconduct, as alleged herein, gave them an unfair competitive advantage over their competitors.

121.    <u>Unlawful</u>:  The unlawful acts and practices of Defendants alleged above constitute unlawful business acts and/or practices within the meaning of California Business & Professions Code §§ 17200, *et seq*.  Defendants' unlawful business acts and/or practices as alleged herein have violated

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

1   numerous laws and/or regulations - federal and/or state, statutory and/or common law - and said

2   predicate acts are therefore *per se* violations of §17200, *et seq.*  These predicate unlawful business acts

3   and/or practices include, but are not limited to, the following:  TILA, 15 U.S.C. §1601, *et seq.* as alleged

4   in § II above;  Federal Trade Commission Act, 15 U.S.C. §§ 41-58, California Civil Code §§ 1572

5   (Actual Fraud - Omissions), 1573 (Constructive Fraud by Omission), and 1710 (Deceit).

6        122.  Unfair: Defendants' omissions and misconduct as alleged in this action constitutes

7   negligence and other tortious conduct and this misconduct gave Defendants an unfair competitive

8   advantage over their competitors.

9        123.  Defendants' misconduct as alleged in The Material Omissions and otherwise alleged

10  herein was unfair because (i) it caused Plaintiffs and Class Members substantial injury by, among other

11  things, causing them to lose equity in their homes, (ii) there were absolutely no countervailing benefits

12  to consumers or to competition that could possibly outweigh this substantial injury, and (iii) this injury

13  could not have been avoided or even discovered by the consumers, because it resulted from Defendants'

14  failure to disclose and/or omission of material information that only the Defendants knew or should have

15  known.

16       124.  The Material Omissions and other misconduct of Defendants alleged herein is and was

17  likely to deceive the public, and in fact did deceive the public, and violated the public policy of the State

18  of California.

19       125.  The harm to Plaintiffs, members of the general public and Class Members outweighs the

20  utility of Defendants' policies, acts and/or practices, and consequently Defendants' conduct herein

21  constitutes an unfair business act or practice within the meaning of California Business & Professions

22  Code §§ 17200, *et seq.*  Defendants' misconduct as alleged herein gave also Defendants an unfair

23  competitive advantage over Defendants' competitors that did not engage in similar conduct.

24       126.  Fraudulent: Through their omissions and/or acts, practices and non-disclosures as alleged

25  herein, Defendants designed the Loan Documents in order to deceive the public through the Material

26  Omissions  leading to consumer confusion, including, but not limited to the fact that, for the first two to

27  five years, the loans were negatively amortizing loans.  Said omissions, acts, practices and non-

28  disclosures as alleged herein therefore constitute fraudulent business acts and/or practices within the

1   meaning of California Business & Professions Code §§ 17200, *et seq.*

2       127.   Defendants' conduct, as fully described above, was designed to and was therefore likely

3   to deceive members of the consuming public, and at all times, Defendants' failures to disclose and their

4   omission of material facts have been and continue to be unfair, fraudulent, untrue and/or deceptive.

5       128.   As a direct and proximate result of the aforementioned omissions, acts and practices,

6   Defendants, and each of them, received monies and continue to hold the monies expended by Plaintiffs

7   and Class Members similarly situated who purchased the ARM loans as described herein.

8       129.   The unfair, deceptive and/or fraudulent business practices of Defendants, as fully

9   described herein, present a continuing threat to members of the public to be mislead and/or deceived by

10  Defendants' loan forms at issue, as described herein.  Plaintiffs and other members of the general public

11  have no other remedy of law that will prevent Defendants' misconduct as alleged herein from occurring

12  and/or reoccurring in the future.

13      130.   As a direct and proximate result of Defendants' unfair and/or fraudulent conduct alleged

14  herein, Plaintiffs and Class Members have lost hundreds of thousands if not millions of dollars of equity

15  in their homes.  Plaintiffs and Class Members are direct victims of the Defendants' unlawful conduct,

16  and each has suffered injury in fact, and has lost money or property as a result of Defendants' unfair

17  competition.

18      131.   WHEREFORE, Plaintiffs and Class Members are entitled to equitable relief, including

19  restitution, restitutionary disgorgement of all profits accruing to Defendants because of their unfair,

20  fraudulent, and deceptive acts and/or practices, attorney's fees and costs, declaratory relief, and a

21  permanent injunction enjoining Defendants from their unfair, fraudulent and deceitful activity.

## XII.

## **PRAYER FOR RELIEF**

24      WHEREFORE, Plaintiffs and all Class Members pray for judgment against each Defendant,

25  jointly and severally, as follows:

26      A.   An order certifying this case as a class action and appointing Plaintiffs Eneida Amparan,

27          Rafael Cisneros and Guadalupe Cisneros as representatives of the California Class,

28          plaintiffs Rafael Cisneros and Guadalupe Cisneros as representatives of the National

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

1    TILA Class, and Plaintiffs' counsel as class counsel for the California Class and the

2    National TILA Class;

3    B.    For actual damages according to proof;

4    C.    For compensatory damages as permitted by law;

5    D.    For statutory damages as permitted by law;

6    E.    For punitive damages as permitted by law;

7    F.    For rescission of the named Plaintiffs' individual loans;

8    G.    For equitable relief, including restitution;

9    H.    For restitutionary disgorgement of all profits Defendants obtained as a result of their

10    unfair competition;

11    I.    For interest as permitted by law;

12    J.    For declaratory relief;

13    K.    For injunctive relief;

14    L.    For reasonable attorneys' fees and costs; and

15    M.    For such other relief as is just and proper.

16    DATED:  August 31, 2009                    **ARBOGAST & BERNS LLP**

17

18                                        By:  _/s/ David M. Arbogast_
                                             David M. Arbogast, Esq.
19                                           19510 Ventura Boulevard, Suite 200
                                             Tarzana, California 91356
20                                           Phone: (818) 961-2000
                                             Fax:    (818) 654-5988
21
                                             Michael A. Bowse (SBN 189659)
22                                           **BROWNE WOODS GEORGE LLP**
                                             2121 Avenue of the Stars, Suite 2400
23                                           Los Angeles, CA 90067
                                             Phone: (310) 274-7100
24                                           Fax:    (310) 275-5697

25                                           Lee A. Weiss (admitted *pro hac vice*)
                                             Rebecca Tingey (admitted *pro hac vice*)
26                                           **BROWNE WOODS GEORGE LLP**
                                             49 West 37th Street, 15th Floor
27                                           New York, New York 10018
                                             Phone: (212) 354-4901
28                                           Fax:    (212) 354-4904

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

Christopher A. Seeger (admitted *pro hac vice*)
**SEEGER WEISS LLP**
One William Street
New York, NY 10004
Phone: (212) 584-0700

Jonathan Shub (SBN 237708)
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, PA 19107
Phone: (215) 564-2300
Fax     (215) 851-8029

Attorneys for Plaintiffs and all others Similarly
Situated

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury to the full extent permitted by law.

DATED:  August 31, 2009                    **ARBOGAST & BERNS LLP**

                              By:   */s/ David M. Arbogast*
                                    David M. Arbogast, Esq.
                                    19510 Ventura Boulevard, Suite 200
                                    Tarzana, California 91356
                                    Phone: (818) 961-2000
                                    Fax:    (818) 654-5988

                                    Michael A. Bowse (SBN 189659)
                                    **BROWNE WOODS GEORGE LLP**
                                    2121 Avenue of the Stars, Suite 2400
                                    Los Angeles, CA 90067
                                    Phone: (310) 274-7100
                                    Fax:    (310) 275-5697

                                    Lee A. Weiss (admitted *pro hac vice*)
                                    Rebecca Tingey (admitted *pro hac vice*)
                                    **BROWNE WOODS GEORGE LLP**
                                    49 West 37th Street, 15th Floor
                                    New York, New York 10018
                                    Phone: (212) 354-4901
                                    Fax:    (212) 354-4904

                                    Christopher A. Seeger (admitted *pro hac vice*)
                                    **SEEGER WEISS LLP**
                                    One William Street
                                    New York, NY 10004
                                    Phone: (212) 584-0700

/ / /

/ / /

43

Jonathan Shub (SBN 237708)
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, PA 19107
Phone: (215) 564-2300
Fax     (215) 851-8029

Attorneys for Plaintiffs and all others Similarly
Situated

THIRD AMENDED CLASS ACTION COMPLAINT - 5:07-cv-04498-JF (RSx)

# EXHIBIT NO. 1

EXHIBIT 1

SEE "PREPAYMENT PENALTY ADDENDUM TO NOTE" ATTACHED HERETO AND MADE A PART HEREOF.

LOAN NO.: 07512004

MIN: 10010980000246596
MERS Phone: 1-888-679-6377

# ADJUSTABLE RATE NOTE
## (MTA - Twelve Month Average Index - Payment Caps)

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.

| JANUARY 05, 2006 | CAMPBELL | CALIFORNIA |
|---|---|---|
| [Date] | [City] | [State] |

2667 BRAHMS AVE, SAN JOSE, CA 95122-
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $     472,000.00          (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed   ONE HUNDRED FIFTEEN AND 000/1000THS    percent ( 115.000 %) of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is
PLAZA HOME MORTGAGE, INC.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          1.500          %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates
The interest rate I will pay may change on the        1st      day of        MARCH, 2006        , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

### (C) Index
Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (D) Calculation of Interest Rate Changes
Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding   THREE AND 400/1000THS    percentage point(s) (      3.400       %) ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than   9.950    %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

PHM000316

3.   PAYMENTS

    (A) Time and Place of Payments

    I will make a payment every month.

    I will make my monthly payments on the        day of each month beginning on     MARCH, 2006    .
I will make these payments every month until I have paid all the Principal and Interest and any other charges described
below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied
to interest before Principal. If, on    FEBRUARY 01, 2036    , I still owe amounts under this Note, I will pay those
amounts in full on that date, which is called the "Maturity Date."

    I will make my monthly payments at   PLAZA HOME MORTGAGE, INC.
5090 SHOREHAM PLACE #109, SAN DIEGO, CA 92122
or at a different place if required by the Note Holder.

    (B) Amount of My Initial Monthly Payments

    Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $     1,628.97
unless adjusted under Section 3 (F).

    (C) Payment Change Dates

    My monthly payment may change as required by Section 3(D) below beginning on the first day of    MARCH, 2007   ,
and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment
also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum
Payment" is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment
Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of
the interest due then negative amortization will occur.

    I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided
in  Section 3(F) or 3(G) below.

    (D) Calculation of Monthly Payment Changes

    At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that
would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity
date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The
result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly
payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5%
limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply
to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by
taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the
number 1.075.  The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me
to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also
have the option to pay the Full Payment for my monthly payment.

    (E) Additions to My Unpaid Principal

    Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject
to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of
the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment
date in full on the Maturity Date in substantially equal payments.  For each month that my monthly payment is less than the
interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and
will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate
required by Section 2.  For each month that the monthly payment is greater than the interest portion, the Note Holder will apply
the payment as provided in Section 3(A).

    (F) Limit on My Unpaid Principal; Increased Monthly Payment

    My unpaid Principal can never exceed the Maximum Limit equal to    ONE HUNDRED FIFTEEN AND 000/1000THS    percent
( 115.000 %) of the Principal amount I originally borrowed. My unpaid principal could exceed that Maximum Limit due to

PHM000317



Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

(G) Required Full Payment
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

(H) Payment Options
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

  (i)     Interest Only Payment:  the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
  (ii)    Fully Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.
  (iii)   15 Year Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.
These Payment Options are only applicable if they are greater than the Minimum Payment.

4.   NOTICE OF CHANGES
The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5.   BORROWER'S RIGHT TO PREPAY
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.
I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6.   LOAN CHARGES
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.   BORROWER'S FAILURE TO PAY AS REQUIRED
(A) Late Charges for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of     FIFTEEN     ( 15 ) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     5.000     % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

PHM000318



(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.   SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option

PHM000319

shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
ENEDA AMPARAN                   -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                        -Borrower

PHM000320

## FEDERAL TRUTH - IN - LENDING DISCLOSURE STATEMENT
(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Creditor:
PLAZA HOME MORTGAGE, INC.

Borrower:
ENEDA AMPARAN

675 NORTH FIRST ST. #900
SAN JOSE, CA 95112
Date: JANUARY 05, 2006
Check box if applicable:

2667 BRAHMS AVENUE
SAN JOSE, CA 95122-
Loan Number: 07512004

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | [ ] Total Sale Price |
|---|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. | The total cost of your purchase on credit including your down-payment of $ N/A |
| 7.136 % | $ 778,980.00 | $ 462,476.28 | $ 1,241,456.28 | $ N/A |

[ ] REQUIRED DEPOSIT: The annual percentage rate does not take into account your required deposit.
PAYMENTS: Your payment schedule will be.

| Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly Beginning: | | | Monthly Beginning: | | | Monthly Beginning: |
| 12 | 1,628.97 | 03/01/2006 | | | | | | |
| 12 | 1,751.14 | 03/01/2007 | | | | | | |
| 12 | 1,882.48 | 03/01/2008 | | | | | | |
| 12 | 2,023.66 | 03/01/2009 | | | | | | |
| 12 | 2,175.44 | 03/01/2010 | | | | | | |
| 300 | 3,759.72 | 03/01/2011 | | | | | | |

THE PAYMENT SCHEDULE AND ANNUAL PERCENTAGE RATE DISCLOSED HERE ARE ESTIMATED ASSUMING THAT THE CURRENT INDEX RATE WILL NOT INCREASE NOR DECREASE THROUGHOUT THE LOAN TERM.

[ ] DEMAND FEATURE: This obligation has a demand feature.
[X] VARIABLE RATE: Your loan contains variable rate features.
[ ] Information regarding the variable rate features of your loan have been provided to you earlier in a separate document.
[X] Information regarding the variable rate features of your loan are provided hereinafter. The annual percentage rate may increase or decrease during the term of this transaction with increases or decreases in the value of the "Index" (or "Reference Rate"). The rate that you will pay may may not be changed more often than every ONE MONTH commencing 03/01/2008.
[ ] Rate Change Limits: The rate may not be changed by more than _____ % on any one Rate Change Date.
[X] The rate will never be greater than 9.950 %
[ ] Any increase in the rate will result in a corresponding increase in the payment.
[X] Rate increases may occur without immediate and/or corresponding payment increases.
[X] Unpaid interest will be added to the principal.
The "Index" (or "Reference Rate") is the:
THE TWELVE MONTH AVERAGE OF THE MONTHLY YIELDS ON UNITED STATES TREASURY SECURITIES, ADJUSTED TO A CONSTANT MATURITY OF ONE YEAR, AS MADE AVAILABLE BY THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM.

INSURANCE: The following insurance is required to obtain credit:
[ ] Credit life insurance and credit disability   [X] Property insurance   [ ] Flood insurance
You may obtain the insurance from anyone you want that is acceptable to creditor.
[ ] If you purchase [ ] property [ ] flood insurance from creditor you will pay $ _____ for one year term.
SECURITY: You are giving a security interest in:
2667 BRAHMS AVE. SAN JOSE, CA 95122-
[ ] The goods or property being purchased   [X] Real property you already own.
FILING FEES: $ 85.00
LATE CHARGE: If a payment is more than 15 days late, you will be charged 5.00 % of the Principal & Interest payment.
PREPAYMENT: If you pay off early, you
[X] may   [ ] will not   have to pay a penalty.
[ ] may   [X] will not   be entitled to a refund of part of the finance charge.
ASSUMPTION: Someone buying your property
[ ] may   [ ] may, subject to conditions   [X] may not   assume the remainder of your loan on the original terms.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.
[ ] a means an estimate   [ ] all dates and numerical disclosures except the late payment disclosures are estimates.

The undersigned acknowledge receiving and reading a completed copy of this disclosure.
Neither you nor the creditor previously has become obligated to make or accept this loan, nor is any such obligation made by the delivery or signing of this disclosure.
[X] I/We have received the Variable Rate Disclosure for the loan program for which I/We have applied.

_____    _____    _____
ENEDA AMPARAN    Date    Date

_____    _____
Date    Date

LENDER SUPPORT SYSTEMS INC. GEN-001 GEN2.B

PHM000321

DATE: JANUARY 05, 2006
BORROWER: ENEIDA AMPARAN

LOAN #: 07512004
PROPERTY ADDRESS: 2667 BRAHMS AVE, SAN JOSE, CA 95122-

## PREPAYMENT PENALTY ADDENDUM

THIS PREPAYMENT PENALTY ADDENDUM is dated          JANUARY 05, 2006          , and is incorporated into and amends and supplements the Note of the same date (the "Note") given by PLAZA HOME MORTGAGE, INC.

(the "Lender"). The Note is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") covering the property (the "Property") identified in the Security Instrument.

The section of the Note entitled "Borrower's Right to Prepay" is replaced with the following new section:

**BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid Principal is known as a "Full Prepayment. A prepayment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Partial or Full Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a Full Prepayment or Partial Prepayments of my obligation. The Note Holder will use all of my prepayments to reduce the amount of Principal that I owe under the Note. If I make a Partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment.

If within the first          TWELVE          ( 12 ) months after the execution of this Note, I make prepayment(s), the total of which exceeds twenty (20) percent of the original Principal amount of this Note, I agree to pay a Prepayment Penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) during the twelve (12) month period immediately preceding the date of the prepayment exceeds twenty (20) percent of the original Principal amount of this Note. Interest will be calculated using the rate in effect at the time of prepayment. I will pay this Prepayment Penalty regardless of whether I sell the Property or refinance the loan with the same Lender or Note Holder.

All other terms and conditions of the above referenced Note remain in full force and effect.

| | | |
|---|---|---|
| ENEIDA AMPARAN | Borrower | Date |
| | Borrower | Date |
| | Borrower | Date |
| | Borrower | Date |

Multistate Prepayment Penalty Addendum - (4-1999)
PR-2201 (04-05)

LEND SUPPORT SYSTEMS, INC. PR2201XX.COU (03/06)

DATE: JANUARY 05, 2006
BORROWER: ENEIDA AMPARAN

CASE #:
LOAN #: 07512004
PROPERTY ADDRESS: 2667 BRAHMS AVE, SAN JOSE, CA 95122-

## ADJUSTABLE RATE MORTGAGE LOAN PROGRAM DISCLOSURE
## MONTHLY TREASURY AVERAGE INDEX - PAYMENT CAPS
## ALL STATES EXCEPT NEW YORK

This disclosure describes the features of an Adjustable Rate Mortgage (ARM) program you are considering.  Information about our other ARM programs will be provided upon request.

| HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED |
| --- |

- Your interest rate will be based on an index rate plus a margin.  Please ask us for our current interest rate and margin.

- The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields").  The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

- Your initial interest rate is not based on the index used to make later adjustments.  Please ask us for the amounts of our current interest rate discounts.

- For the first year of your loan, your payment will be based on the initial interest rate, loan amount and loan term.  After the first year, your payment will be calculated as described below.

| | MTA ARM (initial rate change at 1 month) | MTA ARM (initial rate change at 3 months) |
| --- | --- | --- |
| Your interest rate can change: | On your first payment date and monthly thereafter | On your 3rd payment date and monthly thereafter |
| Each time your interest rate changes, the new interest rate will equal the sum of the index plus the margin, subject to the following limits: | • Your interest rate will be rounded to the nearest 1/8%.<br><br>• Your interest rate will never exceed the maximum set forth in your loan documents.  The maximum rate in effect as of the first business day of January 2005 is 9.95%.  Please ask us for our current maximum rate. | |
| | How Your Payment Can Change | |
| Your payment can change: | • Every year and can increase or decrease substantially based on changes in the interest rate.<br><br>• At every 5th scheduled payment adjustment, you will need to pay the Full Payment until the next payment adjustment date. | |
| | You will be notified in writing at least 25, but no more than 120 days, before the due date of a payment at a new level.  This notice will contain information about the index, your interest rates, payment amount and loan balance. | |
| Your payment will be calculated as follows: | Beginning with the 13th payment and every 12 months thereafter, we will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal balance in full by the maturity date in substantially equal payments at the interest rate in effect during the month preceding the payment change date.  This payment is called the "Full Payment."  Except as otherwise provided, your "Limited Payment" will be the payment amount for the month preceding the payment change date increased by no more than 7.5% ("Payment Cap").  Your new "Minimum Payment" will be the lesser of the Limited Payment and the Full Payment.  You also have the option to pay the Full Payment for your monthly payent.  If you pay less than the Full Payment, then the payment may not be enough to cover the interest due, and any difference will be added to your principal balance.  This means the balance of your loan could increase.  This is known as "negative amortization".  During the loan term, we may provide you with other monthly payment options that are greater than the Minimum Payment ("Payment Options").  Please ask us about these Payment Options. | |
| The unpaid principal of your loan: | Can never exceed 115% (110% in New York) of the original amount borrowed.  This means that your monthly payment may change more frequently than annually and the payment change will not be limited by the 7.5% Payment Cap.  The new Minimum Payment will be in an amount that would be sufficient to pay off the unpaid principal balance over the remaining life of the loan at the current interest rate. | |

| | The examples below illustrate interest rate and payment changes based on a $10,000, 30-year loan. These examples use an initial interest rate in effect on the first business day of January, 2006   and assume the maximum periodic increases in rates and payments. | |
|---|---|---|
| | Examples of loans with a discounted interest rate (below sum of index and margin) | |
| Initial Interest Rate | 1.00% | 1.75% |
| Maximum Interest Rate | 9.95% | 9.95% |
| First Year Payment | $32.16 | $35.72 |
| Maximum payment | $101.46 in the 3rd year | $102.14 in the 3rd year |
| | Examples of loans with a discounted interest rate (below sum of index and margin) | |
| Initial Interest Rate | Not Applicable% | Not Applicable% |
| Maximum Interest Rate | N/A | N/A |
| First Year Payment | N/A | N/A |
| Maximum payment | N/A | N/A |

NOTE: To see what your payment would be, divide your mortgage amount by $10,000, then multiply the monthly payment by that amount. (For example, the monthly payment for a $60,000 MTA ARM Index - Payment Cap loan with a discounted interest rate would be: $60,000/$10,000=6; 6 x $32.16 =$192.96 per month)

ENEIDA AMPARAN                                         Date                                                           Date

_____                               Date                                                           Date

# EXHIBIT NO. 2

EXHIBIT 2

SEE "PREPAYMENT PENALTY ADDENDUM   NOTE" ATTACHED HERETO AND MADE A PART HEREOF.

LOAN NO.:   016100002

**ADJUSTABLE RATE NOTE**
(MTA - Twelve Month Average Index - Payment Caps)

MIN: 100109800000455288
MERS Phone: 1-888-679-6377

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT.  THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE.  THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.

OCTOBER 13, 2006                    ENCINITAS                         CALIFORNIA
[Date]                                    [City]                              [State]

29084 BRIDALVEIL LANE, MENIFEE, CA  92584
[Property Address]

I.   BORROWER'S PROMISE TO PAY
     In return for a loan that I have received, I promise to pay U.S. $        428,000.00        (this amount is called "Principal"), plus interest, to the order of Lender.  The Principal amount may increase as provided under the terms of this Note but will never exceed     ONE HUNDRED TEN AND 000/1000THS     (     110.000     %) of the Principal amount I originally borrowed.  This is called the "Maximum Limit."  Lender is
PLAZA HOME MORTGAGE, INC.                                                                                            .

I will make all payments under this Note in the form of cash, check or money order.
     I understand that Lender may transfer this Note.  Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2.   INTEREST
     (A) Interest Rate
     Interest will be charged on unpaid Principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of        1.750        %.  The interest rate I will pay may change.
     The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

     (B) Interest Rate Change Dates
     The interest rate I will pay may change on the        1st        day of        DECEMBER, 2006        , and on that day every month thereafter.  Each date on which my interest rate could change is called an "Interest Rate Change Date."  The new rate of interest will become effective on each Interest Rate Change Date.  The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

     (C) Index
     Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index.  The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields").  The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.  The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".
     If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information.  The Note Holder will give me notice of this choice.

     (D) Calculation of Interest Rate Changes
     Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding     THREE AND 575/1000THS          percentage point(s) (        3.575        %) ("Margin") to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  This rounded amount will be my new interest rate until the next Interest Rate Change Date.  My interest will never be greater than     9.950     %.  Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

PayOption ARM Note - MTA Index
FE-5312 (0511)                              Page 1 of 5                    LENDER SUPPORT SYSTEMS, INC. FE5312XX.COU (12/05)

3.   PAYMENTS

(A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the    1st    day of each month beginning on              DECEMBER, 2006              .
I will make these payments every month until I have paid all the Principal and Interest and any other charges described
below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied
to interest before Principal. If, on          NOVEMBER 01, 2046          , I still owe amounts under this Note, I will pay those
amounts in full on that date, which is called the  "Maturity Date."

I will make my monthly payments at  PLAZA HOME MORTGAGE, INC.
5090 SHOREHAM PLACE #206, SAN DIEGO, CA  92122
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $    1,240.49
unless adjusted under Section 3(F).

(C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the  1st  day of      DECEMBER, 2007      ,
and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also
will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment"
is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment Change
Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest
due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided
in Section 3(F) or 3(G) below.

(D) Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that
would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity
date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The
result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly
payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment.  This 7.5%
limitation is called the "Payment Cap."  This Payment Cap applies only to the Principal and Interest payment and does not apply
to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by
taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the
number 1.075. The result of this calculation is called the "Limited Payment."  Unless Section 3(F) or 3(G) below requires me to
pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have
the option to pay the Full Payment for my monthly payment.

(E) Additions to My Unpaid Principal

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject
to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the
interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment
date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the
interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and
will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate
required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply
the payment as provided in Section 3(A).

(F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed the Maximum Limit equal to    ONE HUNDRED TEN  AND 000/1000THS        percent
(110.000 %) of the Principal amount I originally borrowed.  My unpaid principal could exceed that Maximum Limit due to

Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

(G) Required Full Payment

On the    fifth    Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

(H) Payment Options

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i) Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii) Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii) 15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

4.   NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.   BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    FIFTEEN    ( 15 ) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000    % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

PayOption ARM Note - MTA Index
FE-5312 (0511)                              Page 3 of 5

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

10.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11.  SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option

shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.


WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.


| | | |
|---|---|---|
| _RAFAEL CISNEROS_____ (Seal) | _GUADALUPE CISNEROS_____ (Seal) |
| -Borrower | -Borrower |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |


PayOption ARM Note - MTA Index
FE-5312 (0511)                              Page 5 of 5

FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Creditor:
PLAZA HOME MORTGAGE, INC.

Borrower:
RAFAEL CISNEROS AND GUADALUPE CISNEROS

5090 SHOREHAM PLACE #206
SAN DIEGO, CA 92122

29084 BRIDALVEIL LANE
MENIFEE, CA 92584

Date: OCTOBER 13, 2006
Loan Number: 016100002

Check box if applicable:

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | [ ] Total Sale Price |
|---|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. | The total cost of your purchase on credit including your down-payment of $ N/A |
| 8.312 % | $ 1,148,508.08 | $ 422,660.10 | $ 1,571,168.18 | $ N/A |

[ ] REQUIRED DEPOSIT: The annual percentage rate does not take into account your required deposit.

PAYMENTS: Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due Monthly Beginning: | Number of Payments | Amount of Payments | When Payments Are Due Monthly Beginning: | Number of Payments | Amount of Payments | When Payments Are Due Monthly Beginning: |
|---|---|---|---|---|---|---|---|---|
| 12 | 1,240.49 | 12/01/2006 | | | | | | |
| 12 | 1,333.53 | 12/01/2007 | | | | | | |
| 1 | 1,433.54 | 12/01/2008 | | | | | | |
| 455 | 3,382.08 | 01/01/2009 | | | | | | |

THE PAYMENT SCHEDULE AND ANNUAL PERCENTAGE RATE DISCLOSED HERE ARE ESTIMATED ASSUMING THAT THE CURRENT INDEX RATE WILL NOT INCREASE NOR DECREASE THROUGHOUT THE LOAN TERM.

[ ] DEMAND FEATURE: This obligation has a demand feature.
[x] VARIABLE RATE: Your loan contains variable rate features.
  [ ] Information regarding the variable rate features of your loan have been provided to you earlier in a separate document.
  [x] Information regarding the variable rate features of your loan are provided hereinafter. The annual percentage rate may increase or decrease during the term of this transaction with increases or decreases in the value of the "index" (or "Reference Rate"). The rate that you will pay may not be changed more often than every ____ONE____ MONTH____ commencing ___12/01/2006___ .
  [ ] Rate Change Limits: The rate may not be changed by more than _____ % on any one Rate Change Date.
  [x] The rate will never be greater than 9.950 %
  [ ] Any increase in the rate will result in a corresponding increase in the payment.
  [x] Rate increases may occur without immediate and/or corresponding payment increases.
  [x] Unpaid interest will be added to the principal.
The "index" (or "Reference Rate") is the:
THE TWELVE MONTH AVERAGE OF THE MONTHLY YIELDS ON UNITED STATES TREASURY SECURITIES, ADJUSTED TO A CONSTANT MATURITY OF ONE YEAR, AS MADE AVAILABLE BY THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM.

INSURANCE: The following insurance is required to obtain credit:
[ ] Credit life insurance and credit disability    [x] Property insurance      [ ] Flood insurance
You may obtain the insurance from anyone you want that is acceptable to creditor.
[ ] if you purchase [ ] property [ ] flood insurance from creditor you will pay $ _____ for one year term.
SECURITY: You are giving a security interest in:
29084 BRIDALVEIL LANE, MENIFEE, CA 92584
[ ] The goods or property being purchased    [x] Real property you already own.
FILING FEES: $ 80.00
LATE CHARGE: If a payment is more than 15 days late, you will be charged 5.00 % of the Principal & Interest payment.
PREPAYMENT: If you pay off early, you
[x] may [ ] will not have to pay a penalty.
[ ] may [x] will not be entitled to a refund of part of the finance charge.
ASSUMPTION: Someone buying your property
[ ] may [ ] may, subject to conditions [x] may not assume the remainder of your loan on the original terms.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.
[ ] e means an estimate    [ ] all dates and numerical disclosures except the late payment disclosures are estimates.

The undersigned acknowledge receiving and reading a completed copy of this disclosure.
Neither you nor the creditor previously has become obligated to make or accept this loan, nor is any such obligation made by the delivery or signing of this disclosure.
[x] I/We have received the Variable Rate Disclosure for the loan program for which I/We have applied.

_____    _____
RAFAEL CISNEROS               Date

_____    _____
GUADALUPE CISNEROS         Date

_____    _____
                     Date

_____    _____
                     Date

DATE: OCTOBER 13, 200b
BORROWER:  RAFAEL CISNEROS AND GUADALUPE CISNEROS

LOAN #:  016100002
PROPERTY ADDRESS:  29084 BRIDALVEIL LANE, MENIFEE, CA  92584

# PREPAYMENT PENALTY ADDENDUM

THIS PREPAYMENT PENALTY ADDENDUM is dated        OCTOBER 13, 2006        , and is
incorporated into and amends and supplements the Note of the same date (the "Note") given by
PLAZA HOME MORTGAGE, INC.

(the "Lender").  The Note is secured by a Mortgage or Deed of Trust or comparable security instrument (the
"Security Instrument") covering the property (the "Property") identified in the Security Instrument.

The section of the Note entitled "Borrower's Right to Prepay" is replaced with the following new section:

### BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due.  A prepayment
of all of the unpaid Principal is known as a "Full Prepayment."  A prepayment of only part of the
unpaid Principal is known as a "Partial Prepayment."  When I make a Partial or Full Prepayment, I
will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a Full Prepayment or Partial
Prepayments of my obligation.  The Note Holder will use all of my prepayments to reduce the amount
of Principal that I owe under the Note.  If I make a Partial Prepayment, there will be no changes in the
due date or in the amount of my monthly payment.

If within the first        THIRTY SIX        (  36  ) months after the execution of this
Note, I make prepayment(s), the total of which exceeds twenty (20) percent of the original
Principal amount of this Note, I agree to pay a Prepayment Penalty in an amount equal to the
payment of six (6) months' advance interest on the amount by which the total of my
prepayment(s) during the twelve (12) month period immediately preceding the date of the
prepayment exceeds twenty (20) percent of the original Principal amount of this Note.  Interest
will be calculated using the rate in effect at the time of prepayment.  I will pay this Prepayment
Penalty regardless of whether I sell the Property or refinance the loan with the same Lender or
Note Holder.

All other terms and conditions of the above referenced Note remain in full force and effect.

_____     Borrower        _____     Date
RAFAEL CISNEROS

_____     Borrower        _____     Date
GUADALUPE CISNEROS

_____     Borrower        _____     Date

_____     Borrower        _____     Date

DATE: OCTOBER 13, 2006
BORROWER: RAFAEL CISNEROS AND GUADALUPE CISNEROS

CASE #:
LOAN #: 016100002
PROPERTY ADDRESS: 29084 BRIDALVEIL LANE, MENIFEE, CA 92584

## ADJUSTABLE RATE MORTGAGE (ARM) LOAN PROGRAM DISCLOSURE
## MONTHLY TREASURY AVERAGE INDEX (MTA) - PAYMENT CAPS

This disclosure describes the features of an Adjustable Rate Mortgage (ARM) program you are considering.  Information about our other ARM programs will be provided upon request.

| HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED |
|---|
| • Your interest rate will be based on an index rate plus a margin.  Please ask us for our current interest rate and margin. |
| • The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields").  The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. |
| • Your initial interest rate is not based on the index used to make later adjustments.  Please ask us for the amounts of our current interest rate discounts. |
| • For the first year of your loan, your payment will be based on the initial interest rate, loan amount and loan term.  After the first year, your payment will be calculated as described below. |

| | MTA ARM (Initial rate change at 1 month) | MTA ARM (Initial rate change at 3 months) |
|---|---|---|
| Your interest rate can change: | On your first payment date and monthly thereafter. | On your 3rd payment date and monthly thereafter. |
| Each time your interest rate changes, the new interest rate will equal the sum of the index plus the margin, subject to the following limits: | • Your interest rate will be rounded to the nearest 1/8%.<br><br>• Your interest rate will never exceed the maximum set forth in your loan documents.  The maximum rate in effect as of the first business day of January 2005 is 9.95%.  Please ask us for our current maximum rate. | |

| How Your Payment Can Change | | |
|---|---|---|
| Your payment can change: | • Every year and can increase or decrease substantially based on changes in the interest rate.<br><br>• At every 5th or 10th Payment Change Date (depending on the loan program you select), and on every 5th Payment Change Date after that, the Minimum Payment will be the Full Payment until the next Payment Change Date. | |
| | You will be notified in writing at least 25, but no more than 120 days, before the due date of a payment at a new level.  This notice will contain information about the index, your interest rates, payment amount and loan balance. | |
| Your payment will be calculated as follows: | Beginning with the 13th payment and every 12 months thereafter, we will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal balance in full by the maturity date in substantially equal payments at the interest rate in effect during the month preceding the payment change date.  This payment is called the "Full Payment."  Except as otherwise provided, your "Limited Payment" will be the payment amount for the month preceding the payment change date increased by no more than 7.5% ("Payment Cap").  Your new "Minimum Payment" will be the lesser of the Limited Payment and the Full Payment.  You also have the option to pay the Full Payment for your monthly payment.  If you pay less than the Full Payment, then the payment may not be enough to cover the interest due, and any difference will be added to your principal balance.  This means the balance of your loan could increase.  This is known as "negative amortization."  During the loan term, we may provide you with other monthly payment options that are greater than the Minimum Payment ("Payment Options").  Please ask us about these Payment Options. | |
| The unpaid principal of your loan: | Can never exceed 110% of the original amount borrowed.  This means that your monthly payment may change more frequently than annually and the payment change will not be limited by the 7.5% Payment Cap.  The new Minimum Payment will be in an amount that would be sufficient to pay off the unpaid principal balance over the remaining life of the loan at the current interest rate. | |

| | The examples below illustrate interest rate and payment changes based on a $10,000, 30-year loan. These examples use an initial interest rate in effect for a 30 year loan on the first business day of January,2006  and assume the maximum periodic increases in rates and payments.  This program may also be available with a 40 year term. | |
|---|---|---|
| | Examples of loans with a discounted interest rate (below sum of index and margin) | |
| Initial Interest Rate | 1.00% | 1.75% |
| Maximum Interest Rate | 9.95% | 9.95% |
| First Year Payment | $32.16 | $35.72 |
| Maximum Payment | $97.00 in the 2nd year | $97.00 in the 3rd year |
| | Examples of loans with a premium interest rate (above sum of index and margin) | |
| Initial Interest Rate | Not Applicable % | Not Applicable % |
| Maximum Interest Rate | N/A | N/A |
| First Year Payment | N/A | N/A |
| Maximum Payment | N/A | N/A |

NOTE: To see what your payment would be, divide your mortgage amount by $10,000, then multiply the monthly payment by that amount. (For example, the monthly payment for a 30 year $60,000 MTA ARM Index - Payment Cap loan with a discounted interest rate would be: $60,000/$10,000=6; 6 x $32.16 =$192.96 per month.)

| | |
|---|---|
| _____ | _____ |
| RAFAEL CISNEROS                          (Date) | GUADALUPE CISNEROS                     (Date) |
| _____ | _____ |
| (Date) | (Date) |

- PayOption ARM Disclosure (MTA)

FE-4273 (0511)